**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| KACEY LEWIS, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:12-cv-1070 (VLB) |
| | : | |
| DR. MARK FRAYNE, DR. ROBERT | : | July 18, 2016 |
| BERGER, AND DR. GERARD GAGNE, | : | |
| Defendants. | : | |

## MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [Dkt. #93]

Plaintiff Kacey Lewis ("Plaintiff" or "Lewis"), an inmate in the Cheshire Correctional Institution, proceeding *pro se*, brings Eighth Amendment deliberate indifference and Fourteenth Amendment procedural due process claims against Defendants Mark Frayne ("Frayne"), Robert Berger ("Berger"), and Gerard Gagne ("Gagne"), doctors at Northern Correctional Institution ("Northern"), in connection with the involuntary administration of psychotropic medication. Plaintiff Lewis has moved for summary judgment. For the reasons that follow, Plaintiff's motion for summary judgment is GRANTED in part and DENIED in part. The Court GRANTS summary judgment in favor of the Plaintiff on his Fourteenth Amendment procedural due process claim and DENIES summary judgment on his Eighth Amendment deliberate indifference claim.

## I.    Factual Background

In October 2010, Plaintiff Lewis was serving a period of incarceration at Northern. [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶ 1; Dkt. #100, Defs.' Rule 56(a)(2) Statement at ¶ 1. Beginning at that time, Defendant Frayne, a supervising psychologist at Northern, began to visit his cell. [*Id.*]; *see also* [Dkt.

#99, Frayne Aff. at ¶ 2].[1]  During these visits, Frayne insisted that Lewis leave his

cell to meet and speak with him.  [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶ 1;

Dkt. #100, Defs.' Rule 56(a)(2) Statement at ¶ 1].  Lewis did not wish to meet with

Frayne and other mental health staff, and repeatedly refused such meetings.

[Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶¶ 2-3; Dkt. #100, Defs.' Rule 56(a)(2)

Statement at ¶¶ 2-3].  Nevertheless, beginning on February 25, 2011, Northern

medical staff began keeping clinical records regarding their visits with Plaintiff

Lewis.  *See* [Dkt. #103 at 5].  Staff visited him multiple times that day and the next

day, February 26, noting that he was not responsive to attempts to speak, but that

he appeared stable.  *See* [*id.*].  There are no records of any interactions between

Plaintiff Lewis and Northern medical staff between February 26 and April 11,

2011.[2]

---

[1] Frayne was employed by the UConn Correctional Managed Health Care Program
("UConn Health") and was assigned to work at Northern.  [Dkt. #99, Frayne Aff.
at ¶ 2].  UConn Health is the provider of healthcare and mental health services
to inmates in Connecticut state prisons.

[2] Plaintiff's medical records, in particular, the Plaintiff's failure to timely seek
them from his former counsel, constitute a source of delay in the efficient
resolution of this case, one of many which the Court feels compelled to address
in this footnote.

After the Defendants answered the Complaint on March 18, 2013, Plaintiff took
no action, allowing the case to sit inactive for more than five months and failing
to commence, let alone complete, discovery by the deadline set forth in the
Court's scheduling order.  *See* [Dkt. ## 17, 21, 23, 25].  As a result, the Court
dismissed the case for failure to prosecute.  [Dkt. #25].  Following a remand by
the Second Circuit, on December 19, 2014, the Court entered an amended
scheduling order, setting jury selection for November 3, 2015.  [Dkt. #31].  After
nearly three more months of inaction, on March 10, 2015, Plaintiff filed a motion
for leave to amend his complaint.  *See* [Dkt. #34].  The motion was not
accompanied by an amended complaint, notwithstanding the express
instruction issued by this Court when it denied Plaintiff's earlier motion to add a
new party, in which the Court stated that "[a] motion to amend a complaint . . .

must be accompanied by a proposed amended complaint . . . as an exhibit to the motion."  [Dkt. #19].  Instead, the Plaintiff appended to his motion a collection of documents, including a 21-page affidavit reiterating and supplementing his original allegations.  *See* [Dkt. #34, Ex. A to Mot. to Amend at 5-27].  On March 16, 2015, Plaintiff moved for the appointment of counsel, which the Court granted three days later.  *See* [Dkt. ## 37, 39].  Counsel was appointed on April 10, 2015, but barely a month later, upon his appointment to the Connecticut judiciary, Plaintiff's counsel was replaced by another attorney.  *See* [Dkt. ## 45-46].

With a seasoned appointed counsel in place, in June 2015, the Court reviewed Plaintiff's voluminous motion to amend and accompanying exhibits and determined that a hearing with the parties, including Plaintiff's counsel, was the most appropriate means by which to expedite the resolution of this long languishing case.  Accordingly, on June 23, 2015, the Court set a hearing for the following month to discuss Plaintiff's motion to amend and whether Plaintiff's new allegations were properly joined.  *See* [Dkt. #48].  On July 28, 2015, the parties appeared before the Court, and appointed counsel stated that he intended to prepare and file a second amended complaint which would appropriately narrow the issues for trial.  *See* [Dkt. #50].  Satisfied that a final amended complaint was soon forthcoming, the Court held in abeyance Plaintiff's March 2015 motion to amend.

Plaintiff's appointed counsel met with Plaintiff on two occasions.  On August 11, 2015, they met and discussed the filing of an amended complaint and determined that limited discovery was necessary.  *See* [Dkt. #55, LaBelle Mem. at ¶ 4].  Thereafter, in November 2015, Plaintiff's counsel sought and obtained nearly a thousand pages of discovery from the Defendants.  [*Id.* at ¶ 6].  Despite having learned that his counsel had obtained discovery and intended to file a second amended complaint on his behalf, on December 18, 2015, the Plaintiff abruptly moved for the withdrawal of his appointed counsel.  *See* [Dkt. #54].  Citing no facts, Plaintiff simply claimed that their "attorney-client relationship has broken down to a point beyond reconciliation."  [*Id.* at 1].  Five days later, on December 23, 2015, Plaintiff's counsel attempted to meet with Plaintiff a second time, but the Plaintiff refused to meet with him, ending the conference abruptly and insisting that counsel be removed.  *See* [Dkt. #55, LaBelle Mem. at ¶ 8].  On January 8, 2016, the Court gave Plaintiff a final opportunity to consider his need for appointed counsel and withdraw his motion by January 22, 2016, citing the voluminous discovery the Defendants produced to his attorney, the technical nature of some of his claims, the outstanding deadlines in this case, which the Court previously extended to accommodate the Plaintiff, and the experience and quality of his appointed counsel.  *See* [Dkt. #58 at 1].  On January 22, 2016, in the absence of any response from the Plaintiff, the Court granted his withdrawal motion.  *See* [Dkt. #61].  Less than a month later, on February 10, 2016, after carefully reviewing Plaintiff's proposed amendments to his Complaint, the Court granted and denied, in part, his motion to amend,

On April 12, 2011, Defendant Frayne again visited Plaintiff Lewis's cell, along with his colleague, Defendant Gagne, another psychologist at Northern. [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶ 4; Dkt. #100, Defs.' Rule 56(a)(2) Statement at ¶ 4]. During this meeting, Defendant Frayne questioned Plaintiff Lewis about a court case Lewis had filed approximately three months earlier, on January 20, 2011, in the Superior Court of Connecticut. [*Id.*].[3] Lewis contends that when he refused to answer Frayne's questions, Frayne told him that he "should stop going to court," and stated that "if things did not go right the next time" Lewis went to court, Frayne "was going to deal with [him.]" [Dkt. #34, Ex. A to Pl.'s Am. Compl., Lewis Aff. at ¶ 1; Dkt. #34, Ex. B to Am. Compl. at 1].[4] Medical

identifying the specific paragraphs of his accompanying affidavit which required a response from the Defendants, and explaining to the Plaintiff why the remaining allegations were not properly joined. *See* [Dkt. #72]. The same day, the Court, yet again, extended the deadlines in this case and reopened discovery. *See* [Dkt. #73].

Notwithstanding the numerous extensions of time and effort by the Court to narrow the issues in dispute, at the parties' final pretrial hearing, on June 21, 2016, the Plaintiff asserted that he was still unable to proceed to trial because he did not receive the 979 page document production the Defendants produced to his former counsel more than six months earlier. However, under questioning from the Court, the Plaintiff admitted that his attorney had previously offered to provide him with the records, but the Plaintiff refused them. At the hearing, in an effort to avoid yet another extended delay, counsel for the Defendants agreed to provide the Plaintiff with another copy of these records.

[3] The matter was captioned, *Lewis v. State of Connecticut*, No. UWY-CV11-5016132-S (Conn. Super. Ct. filed Jan. 20, 2011). *See* [Dkt. #34, Ex. A to Pl.'s Am. Compl., Lewis Aff. at ¶ 1]. Lewis asserts that this case concerned a petition for a new criminal trial. *See* [Dkt. #34, Ex. B to Pl.'s Am. Compl. at 1].

[4] This exchange is subject to much dispute between the parties. While the Defendants do not dispute Plaintiff Lewis's assertion that Defendant Frayne raised the topic of Lewis' pending case and asked him about it, nor do they expressly disavow the statement Lewis attributes to Frayne, they deny that

4

records documenting this April 12, 2011 meeting state that ██████████

████████████████████████████████████████████████████████

███████████████ [Dkt. #103 at 5]. The records further indicate that ██

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████ [*Id*.]. According to the medical records, ██████████

████████████████████████████████████████████████████

███████████████████ [*Id*. at 4-5]. The records state that ██████

██████████████████████████████████████████████

████████████████████████ [*Id*. at 4]. The records from this

encounter are the first to mention ████████████████████████████

████████████████████████████ At the bottom of that day's

medical records is ████████████████████████████ [*Id*.].

On May 19, 2011, Defendant Frayne returned to Plaintiff Lewis's cell and

ordered that he be removed from the cell against his will and placed in a cell in

the medical unit. [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶ 6; Dkt. #100, Defs.'

Rule 56(a)(2) Statement at ¶ 6]. Medical records were prepared regarding this

encounter, and a stamp appears at the bottom of that day's records, which states

---

Frayne threatened Lewis in retaliation for his court proceedings. *See* [Dkt. #100, Defs.' Rule 56(a)(2) Statement at ¶ 4; Dkt. #99, Frayne Aff. at ¶ 16]. Some of the uncertainty may stem from Plaintiff Lewis's Rule 56(a)(1) Statement, which does not include the statement Frayne allegedly made to Lewis, but instead asserts in a conclusory manner that Frayne "made threats to the Plaintiff about continuing to go to court." [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶ 4].

████████████████████████ [Dkt. #103 at 4]. Defendant Frayne also appears to have signed that day's records. [*Id.*]. The records state that ████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████ [*Id.*].

Following this meeting, Plaintiff Lewis was transferred to a cell in the medical unit. The parties dispute the condition of the cell and the clothing items with which Lewis was provided upon his transfer. Lewis contends that the cell was filthy, "infested with ants and flies, and with excrement smeared on the walls and floors." [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶ 7]. He further maintains that he was at first required to be barefoot, and was later given to wear "soiled underwear and socks previously worn by another prisoner." [*Id.* at ¶¶ 8-9]. The Defendants deny these allegations. *See* [Dkt. #100, Defs.' Rule 56(a)(2) Statement at ¶¶ 7-9; Dkt. #99, Frayne Aff. at ¶ 10].

Throughout the remainder of the month, Plaintiff Lewis was monitored in the medical unit. On May 31, 2011, in addition to continuing to refuse to speak with medical staff, staff records state that Lewis █████████████████████

████████████████████████ and doctors noted that ██

████████████████████████ [Dkt. #103 at 2-3]. As a result of these observations, Defendant Gagne concluded ██████████████████████

████████████████████████ [*Id.* at 3].

The same day, May 31, Plaintiff Lewis learned that Defendant Gagne had requested that a panel of doctors be convened the following day, June 1, 2011, to assess whether Lewis should receive involuntary medication. [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶ 12; Dkt. #101, Gagne Aff. at ¶ 6]. The parties dispute whether Lewis was ever told the reasons for the involuntary medication and whether Lewis was ever offered the assistance of an advocate at the hearing. [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶¶ 12-13; Dkt. #100, Defs.' Rule 56(a)(2) Statement at ¶¶ 12-13; Dkt. #99, Frayne Aff. at ¶ 12; Dkt. #101, Gagne Aff. at ¶ 6]. However, Defendant Frayne admits that he served as Lewis's advocate at the hearing. [Dkt. #99, Frayne Aff. at ¶ 12]; *see also* [Dkt. #103 at 7 (███████████████████████████████████████████████].

On the morning of June 1, 2011, Lewis was found to be ███████████ ███████████████████████ [Dkt. #103 at 3]. Later that day, the medical panel convened to conduct a review of the records prepared by health staff regarding Plaintiff Lewis and to provide the Plaintiff with an opportunity to respond. The panel was comprised of three members of the medical staff, Defendant Frayne, Defendant Berger, and a registered nurse. [Dkt. #99, Frayne Aff. at ¶ 12; Dkt. #101, Gagne Aff. at ¶ 6]. Dr. Gagne submitted to the panel a form in support of his involuntary medication request. The form stated that Lewis████████████████ █████████████████████████████████████ [Dkt. #103 at 1]. In support of these diagnoses, Gagne informed the panel that █████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████

█████████ [*Id.*].  Gagne recommended ████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████ [*Id.*].[5]  Finally, Gagne represented to the panel that █████████

██████████████████████████ [*Id.*].

There is no evidence that Defendant Frayne actually advocated on behalf of Plaintiff Lewis's opposition to involuntary medication at the hearing, nor is there any evidence that Defendant Frayne made any effort prior to the hearing to investigate any basis, or fashion any rationale, to support Lewis's objection to being forcibly medicated.  Indeed, the record is barren on what, if anything, Defendant Frayne said at the hearing.  The Defendants contend that Plaintiff Lewis refused to cooperate with the panel process or to speak with his assigned advocate, Defendant Frayne.  [Dkt. #99, Frayne Aff. at ¶ 13; Dkt. #101, Gagne Aff. at ¶ 7].

The panel found that Lewis presented ████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████ [Dkt. #103 at 6].  The panel further found that, ████████████████████████████████████████████████████████████

████████████████████████████████ [*Id.*].  Accordingly, the panel adopted Defendant Gagne's primary diagnosis of psychosis and secondary diagnosis of paranoid schizophrenia and authorized the health staff at

---

[5] Plaintiff Lewis denies that he ever assaulted an attorney, and contends that Gagne's statement was false.  *See* [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶ 35]; *see also* [Dkt. #95 at 2].

8

the prison to involuntarily administer psychoactive medications to the Plaintiff. [*Id.* at 1, 6]; *see also* [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶ 16; Dkt. #100, Defs.' Rule 56(a)(2) Statement at ¶ 16].

Between June 1 and November 18, 2011, Defendant Gagne ordered that Plaintiff Lewis receive a total of approximately forty-two injections of psychoactive medications.  [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶¶ 17-18; Dkt. #100, Defs.' Rule 56(a)(2) Statement at ¶¶ 17-18].  Lewis objected to these injections, and when he refused to receive them, Gagne and Frayne ordered that they be administered by force.  [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶¶ 17-18, 28; Dkt. #100, Defs.' Rule 56(a)(2) Statement at ¶¶ 17-18, 28].  During some of the Defendants' attempts to administer the medication, Plaintiff Lewis was taken from his cell, held down, shackled in chains, and sprayed with capsicum.  [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶¶ 19-23, 28; Dkt. #100, Defs.' Rule 56(a)(2) Statement at ¶¶ 19-23, 28].  In addition, on July 11, 2011, Defendant Frayne instructed a custody supervisor lieutenant to place Lewis in shackles and a belly chain for three days and to issue Lewis a disciplinary report because he refused an injection of medication.  [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶ 30; Dkt. #100, Defs.' Rule 56(a)(2) Statement at ¶ 30].  Plaintiff Lewis contends, and the Defendants deny, that one of these medications, "Haldol," caused him to develop tardive dyskinesia, a severe neurological disorder, irreversible in some cases, which causes involuntary, repetitive, tic-like muscle movements, especially

around the face.  [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶ 24; Dkt. #100, Defs.' Rule 56(a)(2) Statement at ¶ 24].[6]

Shortly after he began receiving the involuntary injections of medication, Plaintiff Lewis sought administrative review of the June 1, 2011 panel decision. The review was performed by Defendant Frayne, who denied Lewis's request. [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶ 33; Dkt. #100, Defs.' Rule 56(a)(2) Statement at ¶ 33].

## II.    Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd*

---

[6] While Plaintiff maintains that he suffers from this disorder, over the last year, he has appeared before this Court in person on numerous occasions, including representing himself in a three-and-a-half day jury trial, and he has not displayed any outward symptoms.  *See Lewis v. Waterbury*, No. 3:10-cv-00112 (VLB) (D. Conn. Sept. 30, 2015).

*Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).  In addition, determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment, as such are within the sole province of the jury.  *Hayes v. New York City Dep't of Corr.*, 84 F. 3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch–Rubin v. Sandals Corp.,* No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, 817 F. Supp. 2d 28, 37 (D. Conn 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712, 727 (2d Cir. 2010).

III.  <u>Analysis</u>

   A.  <u>Triable Issues of Fact Remain as to the Defendants' Intent Precluding Summary Judgment on Plaintiff's Eighth Amendment Claim</u>

   The Eighth Amendment imposes a duty on prison officials "to take reasonable measures to guarantee the safety of inmates in their custody."  *Hayes v. New York City Dep't of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996).  "In order to

establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976)).  To establish deliberate indifference, a prisoner must satisfy a two-part test.  "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.'"  *Id*. (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)).  In assessing the seriousness of a medical condition, courts in this Circuit consider several factors, including "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain."  *Id*. (citation and quotation omitted).

   "Second, the defendant 'must act with a sufficiently culpable state of mind.'"  *Id*.  A prison official acts with a culpable state of mind when he "'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  *Id*. (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979, 128 L. Ed. 2d 811 (1994)).  "[W]hile mere medical malpractice is not tantamount to deliberate indifference, certain instances of medical malpractice may rise to the level of deliberate indifference; namely, when the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a

conscious disregard of a substantial risk of serious harm." *Id.* (citation and quotations omitted).

Here, there remain disputes of fact with regard to Plaintiff Lewis's Eighth Amendment claim. First, the forty-two injections of psychoactive medications Plaintiff received over a five-month period are sufficient to satisfy the objective test. [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶¶ 17-18; Dkt. #100, Defs.' Rule 56(a)(2) Statement at ¶¶ 17-18]. To the extent such medication was unnecessary, the amount and prolonged administration could reasonably result in tardive dyskinesia, with which the Plaintiff claims that he is afflicted, as well as degeneration or extreme physical pain or emotional distress. However, a dispute of fact remains as to whether any of the Defendants acted with deliberate indifference in ordering and administering the injections. Plaintiff Lewis sets forth evidence that Defendant Frayne spoke with him on April 12, 2011, less than two months before the medical panel was convened, about his appeal of his state court conviction, and may have attempted to dissuade him from pursuing it. [Dkt. #34, Ex. A to Pl.'s Am. Compl., Lewis Aff. at ¶ 1; Dkt. #34, Ex. B to Am. Compl. at 1; Dkt. #100, Defs.' Rule 56(a)(2) Statement at ¶ 4]. Defendant Gagne was also present during this conversation, and his notes state that ███████████ ████████████████████████████████████████████████████████ ███████████████████████████████ [Dkt. #103 at 5]. The medical records from this date are ███████████████████████████████ ████████████████████████████████████████████████████

[*Id.* at 4]. Defendants offer no evidence in support of their claim that they had

reason to believe that Plaintiff Lewis threatened an attorney in Waterbury Superior Court. There is no transcript of the proceedings, witness affidavit, or any other evidence substantiating the claim. Indeed, in response to interrogatories asking how he learned of this alleged incident, Defendant Gagne responded, "I do not recall." *See* [Dkt. #93, Ex. Q to Pl.'s Mot. for Summ. J. at 3-4].

Less than a month later, Lewis was removed by Defendant Frayne from his cell and put in a medical unit, where he was more frequently monitored by health staff, including Gagne and Frayne, whose medical records during this time served as the basis for Gagne's recommendation that Lewis be involuntarily medicated. [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶ 6; Dkt. #100, Defs.' Rule 56(a)(2) Statement at ¶ 6]. At the hearing before the medical panel, Defendant Gagne advocated for involuntary medication and Lewis's appointed advocate was Defendant Frayne. There is no evidence that Defendant Frayne advocated on behalf of Lewis or that he ever sought or presented evidence in support of his opposition to involuntary medication. Defendant Frayne also subsequently presided over and denied Lewis' appeal of the panel's decision. Given the potential conflict of interest, Lewis has set forth facts which could dispute the Defendants' claim that the decision to medicate him was the product of objective clinical judgment, as opposed to personal animosity and retaliation, as Lewis claims. However, Lewis has not set forth sufficient evidence to overcome the medical data and findings of the physician panel, which, if valid, would justify involuntary medication and his placement in a medical unit. As a consequence,

there are triable issues of fact as to the second and third prongs of the deliberate indifference test.

   **B. Plaintiff Lewis is Entitled to Summary Judgment on his Fourteenth Amendment Procedural Due Process Claim**

   In addition to an Eighth Amendment right to be free from deliberate indifference, "[i]nmates have a Fourteenth Amendment due process right to be free from involuntary medication with antipsychotic drugs." *Riddick v. Chevalier*, No. 3:11-cv-1555 (SRU), 2013 WL 4823153, at *3 (D. Conn. Sept. 9, 2013) (citing *Washington v. Harper*, 494 U.S. 210, 221-22 (1990)). Nevertheless, "'[t]he Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest.'" *Id.* (quoting *Harper*, 494 U.S. at 227). When considering whether forced medication is necessary, courts are to defer to the judgment of medical personnel, but only where "'[a]dequate procedures exist' to ensure that involuntary medication is appropriate . . . ." *Batts v. Boganoff*, No. 3:04-cv-1191 (MRK/WIG), 2005 WL 3543774, at *6 (D. Conn. Dec. 8, 2005) (quoting *Harper*, 494 U.S. at 233)).

   Here, Defendant Frayne's involvement in Lewis's treatment prior to and continuing after the hearing, his supervisory role at Northern, his appointment as Lewis's advocate at the hearing, the absence of any indication that Frayne actually advocated against the forcible administration of medication against Lewis's will, and his membership on the three-person health panel charged with deciding whether to authorize Lewis's involuntary medication, collectively, render

unconstitutional the procedures under which the panel reached its decision and Lewis was forcibly medicated against his will.

In *Washington v. Harper*, 494 U.S. 2010 (1990), the Supreme Court addressed the procedural safeguards sufficient to permit for the involuntary medication of an inmate with psychoactive medication. Among the safeguards the Court considered in assessing whether the prison had "[a]dequate procedures" in place were whether the inmate: (i) was given a hearing in front of independent panel members with mental health expertise; (ii) was permitted to appear before the panel and present evidence; and (iii) was afforded an independent representative to advocate for him. *Batts*, 2005 WL 3543774, at *6 (citing and quoting *Harper*, 494 U.S. at 233, 235, 236).[7]

---

[7] In their supplemental memorandum of law, the Defendants baselessly contend that language in *Harper* referencing "the independence of a lay advisor is dicta, and at best one element of an overall analysis of the fairness of the particular process before the court at the time." [Dkt. #132, Defs.' Suppl. Mem. at 9]. In addition to providing no authority for this assertion, Defendants elsewhere direct the Court to *Batts*, which they claim involved a "panel process" that was "identical" to the one employed here. [*Id.*]. Indeed, *Batts* is the only post-*Harper* case the Defendants address in their supplemental memorandum. Defendants overlook two critical aspects of *Batts*. First, there is no indication in *Batts* that the inmate's advocate or panel included anyone who was previously involved in the diagnosis or treatment of the inmate, thus, the independence of the panel was not at issue. Second, the *Batts* court considered and quoted the portion of *Harper* discussing an independent lay advisor. *Batts*, 2005 WL 3543774, at *6 (citing and quoting *Harper*, 494 U.S. at 236, and concluding that "sufficient safeguards ensured that the involuntary medication of Mr. Batts was appropriate," in part, because he "was afforded a representative to advocate for him").

1. **Failure to provide Plaintiff Lewis with an independent decision maker was itself a denial of due process.**

With regard to the first factor, composition of the panel, the *Harper* court found the "'independence of the decision maker' of particular significance." *Batts*, 2005 WL 3543774, at *6 (quoting *Harper*, 494 U.S. at 233). Indeed, federal courts, citing the Bureau of Prisons ("BOP") post-*Harper* regulations, frequently note that the hearing must be "before a psychiatrist who is not currently involved in the diagnosis or treatment of the inmate." *U.S. v. Hardy*, 878 F. Supp. 2d 373, 381 (E.D.N.Y. 2012) (citing BOP regulations which are "roughly equivalent to those approved in *Harper*"), *aff'd*, 724 F.3d 280 (2d Cir. 2013); *see also U.S. v. Loughner*, 672 F.3d 731, 753 (9th Cir. 2012) ("The hearing officer must be a psychiatrist who is not the attending psychiatrist and who is not involved in the diagnosis or treatment of the inmate, thus ensuring that there is an independent decision maker.") (citing 28 C.F.R. § 549.46(a)(4)); *U.S. v. White*, 431 F.3d 431, 433 (5th Cir. 2005).[8] Defendants contend that "the core procedural requirements required by *Harper* were met" because the involuntary medication was "both prescribed by [Plaintiff Lewis's] treating psychiatrist at his correctional facility (Dr. Gagne) and approved by a reviewing psychiatrist who provided no services

---

[8] While these and other cases cited below concern pretrial, rather than post-conviction inmates, in *Sell v. United States*, 539 U.S. 166, 178 (2003), the Supreme Court adopted the "framework" set forth in *Harper* in determining whether an incarcerated defendant awaiting trial may be involuntarily medicated to render them competent to stand trial. Both before and after *Sell*, which was decided eight years before the hearing in this case, courts have applied *Harper* and the BOP's post-*Harper* regulations to pretrial detainees.

at the plaintiff's facility (Dr. Berger)."  [Dkt. #132, Defs.' Suppl. Mem. at 6].

Defendants are mistaken.

Under the UConn Health Policy and Procedures in effect at the time, the hearing panel was charged with "review[ing] the referring physician's findings, interview[ing] the inmate, and arriv[ing] at a decision."  [*Id.* at 15].  Thus, as a member of the panel, Defendant Frayne played a role in deciding whether involuntary medication of Plaintiff Lewis was appropriate.[9]

Defendants admit that, at the time Defendant Frayne sat on the panel, he "was involved in [P]laintiff's care."  [*Id.* at 3].  In fact, the record indicates that Defendant Frayne became involved in Plaintiff Lewis's diagnosis and treatment eight months prior to the hearing, and he remained active in his evaluation and treatment ever since.  Defendant Frayne began observing Lewis in his cell in October 2010.  [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶ 1; Dkt. #100, Defs.' Rule 56(a)(2) Statement at ¶ 1].  During these visits, Frayne insisted that Lewis leave his cell to meet and speak with him, but Lewis repeatedly refused his requests.  [*Id.*].  In the two months leading up to the hearing, Frayne visited Lewis's cell on multiple occasions.  On April 12, 2011, he was accompanied by Defendant Gagne, Lewis's designated treating psychiatrist who diagnosed him and advocated before the panel that Lewis be involuntarily medicated.  During this meeting, ████████████████████████████████████████████████████

███████████████████████████████████████████  [Dkt. #93-2, Pl.'s Rule 56(a)(1)

---

[9] While independent panel member, Defendant Berger, drafted a note summarizing the findings of the panel, the Defendants make clear that it was "*the panel*" which "decided to authorize Dr. Gagne to involuntarily medicate the plaintiff as needed."  [Dkt. #132, Defs.' Suppl. Mem. at 3 (emphasis added)].

Statement at ¶ 4; Dkt. #100, Defs.' Rule 56(a)(2) Statement at ¶ 4; Dkt. #103 at 4-5].

Thereafter, and "throughout the months of April and May 2011," after observing

"increasingly paranoid, hostile and aggressive behaviors," Defendant Frayne

"became increasingly concerned that Mr. Lewis was becoming so unstable as to

require infirmary care." [Dkt. #99, Frayne Aff. At ¶ 8].

      Accordingly, on May 19, 2011, Defendant Frayne returned to Lewis's cell

and ordered that he be removed from the cell against his will and placed in a cell

in the medical unit. [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶ 6; Dkt. #100,

Defs.' Rule 56(a)(2) Statement at ¶ 6]. Frayne's medical records from that day's

visit state ██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

██████████ [Dkt. #103 at 4]. Throughout the remainder of May 2011, Plaintiff

Lewis was monitored in the medical unit, and these observations served as the

basis for Defendant Gagne's request for a panel to consider Lewis's involuntary

medication. Indeed, in his affidavit, Defendant Frayne states that the June 1, 2011

panel was convened "to review Mr. Lewis's presentation *and my*

*recommendation*." [Dkt. #99, Frayne Aff. at ¶ 12 (emphasis added)].

      Given these facts, Defendant Frayne did not, nor could he, serve as an

independent member of the panel. Thus, Plaintiff Lewis was deprived of an

independent decision maker, which both the Defendants and courts agree is one

of the "more critical [] factors" under *Harper*. [Dkt. #132, Defs.' Suppl. Mem. at 7].

**2. The absence of an independent advocate and Defendant Frayne's failure to seek out or put forth any evidence, reasons, or advocacy in support of Plaintiff Lewis's liberty interest not to be medicated further renders the hearing procedures constitutionally deficient as applied to Lewis.**

A second troubling aspect of the procedures governing Plaintiff Lewis's involuntary medication hearing was the appointment of Defendant Frayne, an individual who was previously involved in his diagnosis and whose pre-hearing conduct indicated that he *supported* such medication, to serve as his advocate at the hearing.

An inmate is entitled to assistance from prison staff during an involuntary medication hearing. In *Harper*, the Supreme Court stated that "an independent lay adviser who understands the psychiatric issues involved is sufficient protection." *Harper*, 494 U.S. at 236. The Court further found the hearing to be "an adversary hearing." *Id.* at 235. In light of these instructions, numerous courts have recognized a right of an inmate to "[a] competent representative adviser not currently involved in the offender's current treatment . . . to assist the offender during the hearing process." *Bomprezzi v. Hoffman*, No. 13-cv-02085-CMA-NYW, 2015 WL 5173587, at **5, 9 (D. Colo. Aug. 10, 2015) (applying *Harper* and finding plaintiff was afforded sufficient due process); *see also U.S. v. Weston*, 55 F. Supp. 2d 23, 25, n. 3 (D.D.C. 1999) (quoting federal institution memo entitled "Duties of a Staff Representative," which required, among other things, that the representative "be impartial and able to act in the best interests of the inmate" by assisting the inmate with presenting "the best alternative possible to the proposed involuntary medication"). Accordingly, in evaluating a prison's involuntary medication procedures, courts carefully consider whether the

**20**

appointed staff representative had any prior involvement in the treatment of the inmate and whether they affirmatively advocated in support of his liberty interest at the hearing. *See U.S. v. Humphreys*, 148 F. Supp. 2d 949, 953 (D.S.D. 2001) (holding advocate "did not meet the requirements of due process" where she failed to "present[] any evidence" or "reasons for objecting to the medication" and instead "testified against [the inmate]" and had previously "filed a disciplinary report against [him]"); *Loughner*, 672 F.3d at 764 (stating that staff representative's "failure to present any affirmative evidence or question any of the evidence in support of involuntary medication may indicate that his representation was unqualified or procedurally defective" which, absent additional evidence in the record, "might well" warrant a remand "for further proceedings or a new *Harper* hearing").

For the reasons stated above, Defendant Frayne's prior diagnostic and treatment history of Plaintiff Lewis rendered him unable to serve as an independent and impartial advocate in support of Lewis's liberty interest not to be involuntarily medicated. This conclusion is bolstered by Frayne's performance at the hearing. In short, the Defendants offer no evidence that Defendant Frayne advocated at all on behalf of Plaintiff Lewis's liberty interest. In their affidavits, Defendants Frayne and Gagne state only that Plaintiff Lewis refused to cooperate with the panel process. [Dkt. #99, Frayne Aff. at ¶ 13; Dkt. #101, Gagne Aff. at ¶ 7]. A refusal on the part of the inmate to participate in the hearing does not waive the inmate's right to a constitutionally adequate advocate. *See Weston*, 55 F. Supp. 2d at 26-27 (remanding decision authorizing pretrial

involuntary medication of inmate defendant where his staff representative "said nothing at the hearing other than that the defendant had refused to talk to him" and the record did not indicate that the representative "reviewed the defendant's files to locate evidence favorable to the defendant" or searched for favorable witnesses).  Defendant Frayne appears not to have sought or presented any evidence in support of Lewis's position at the hearing.  None of the statements in (the very difficult to read) handwritten summary of the panel's conclusions authored by Defendant Berger appear to mention any considerations against involuntary medication.  *See* [Dkt. #103 at 6].  Finally, not only is there no indication that Defendant Frayne assisted Lewis with the administrative appeal of the panel's decision, the parties agree that Defendant Frayne actually conducted the review of Lewis's appeal and denied it.  [Dkt. #93-2, Pl.'s Rule 56(a)(1) Statement at ¶ 33; Dkt. #100, Defs.' Rule 56(a)(2) Statement at ¶ 33].  In light of these facts, it cannot be said that Plaintiff Lewis received due process of law to challenge the recommendation that he be involuntarily medicated.

That said, in response to statements by defense counsel at the hearing on Plaintiff's motion and in the Defendants' supplemental filing regarding "the subjective intent or motives" of Defendant Frayne, the Court reaffirms its position that, in granting summary judgment to Plaintiff Lewis on his procedural due process claim, it is not suggesting that Defendant Frayne or any other Defendant intended to violate the Plaintiff's due process rights or to otherwise harm him. [Dkt. #132, Defs.' Suppl. Mem. at 5].  Indeed, intent is not an element of a due process claim.  *See Bryant v. N.Y. State Educ. Dep't,* 692 F.3d 202, 218 (2d Cir.

2012) ("A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process.") (citation omitted).  Similarly irrelevant for the purposes of the present motion is the Defendants' contention that the Plaintiff "has never identified one fact or issue that could have plausibly altered the panel decision had it become known to the panel."  [Dkt. #132, Defs.' Suppl. Mem. at 10].  Certainly, the Defendants may raise this fact in contesting damages on this claim, since "[a]bsent a showing of causation [of the plaintiffs' injuries by the defendants' unconstitutional acts] and actual injury, a plaintiff is entitled only to nominal damages" on a due process claim.  *Warren v. Pataki*, ---F.3d----, 2016 WL 2865572, at *11 (2d Cir. May 17, 2016) (quoting *Miner v. City of Glen Falls*, 999 F.2d 655, 660 (2d Cir. 1993)).  This does not, however, alter the fact that Lewis did not have an adversarial hearing conducted by an impartial panel with the support of an independent advocate who was able to and did in fact act in the best interests of the inmate by presenting the best alternative possible to the proposed involuntary medication, as required for the Plaintiff to have received constitutionally adequate procedural due process.

3. <u>Consideration of Defendants' unbriefed qualified immunity defense does not compel a different result</u>.

As an initial matter, although the Defendants asserted the affirmative defense of qualified immunity in their Answer, they offer no argument in support of this defense in either of their opposition briefs to Plaintiff's motion for summary judgment, nor have they affirmatively moved for summary judgment on the basis of this defense.  *See* [Dkt. ## 21, 99, 132].  Accordingly, the Defendants

appear to have waived the defense with respect to Plaintiff's procedural due process claim. *See Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) ("Qualified immunity is an affirmative defense that may be waived if, as here, the defendants failed to move for summary judgment on this defense, even if, also as here, the defendants asserted the defense in their answer.").

Even if the Defendants have not waived the defense, "this Court is not required, *sua sponte*, to develop, analyze, and rule on arguments where defendants have offered none." *Johnson v. Greiner*, No. 03 Civ. 5276 (DLC), 2007 WL 2844905, at *9 (S.D.N.Y. Sept. 28, 2007) (declining to consider qualified immunity defense raised in summary fashion by defendants in their motion for summary judgment).

Finally, even if the Court were to consider the defense, such consideration would be unavailing. The clear language in *Harper* concerning the "independence of the decisionmaker" and the "provision of an independent lay adviser who understands the psychiatric issues involved" render the defense inapplicable. *Harper*, 494 U.S. 233, 236. At the time of Plaintiff Lewis's hearing, a reasonable prison official would have known that the failure to provide an inmate with either an independent decision maker or independent advocate "violate[s] clearly established statutory or constitutional rights," and it would not have been objectively reasonable for them to have believed otherwise. *Bradway v. Gonzalez*, 26 F.3d 313, 317-18 (2d Cir. 1994).

IV.     <u>Conclusion</u>

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is GRANTED in part and DENIED in part. Trial will go forward on liability and damages in connection with Plaintiff Lewis's Eighth Amendment claim, and solely with respect to damages on his Fourteenth Amendment procedural due process claim.

IT IS SO ORDERED

_____/s/_____
Vanessa L. Bryant,
United States District Judge