UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| KACEY LEWIS, : | |
|     Plaintiff, : | |
| : | CIVIL ACTION NO. |
| v. : | 3:12-cv-1070 (VLB) |
| : | |
| DR. MARK FRAYNE, DR. ROBERT : | November 16, 2017 |
| BERGER, AND DR. GERARD GAGNE, : | |
|     Defendants. : | |

### Ruling Granting Motion to Reopen Case

Before the Court is Plaintiff's Motion to Reopen Case. [Dkt. 277.] Plaintiff's Motion is GRANTED for the reasons set forth below.

I. Background

Plaintiff Kacey Lewis ("Plaintiff" or "Mr. Lewis"), an inmate at the MacDougall-Walker Correctional Institution, proceeding *pro se*, brings Eighth Amendment deliberate indifference and Fourteenth Amendment due process claims against Defendants Mark Frayne ("Frayne"), Robert Berger ("Berger"), and Gerard Gagne ("Gagne"), doctors at Northern Correctional Institution ("Northern"), in connection with the involuntary administration of psychotropic medication. [Dkt. 1.]

Jury selection occurred on January 3, 2017. After jury selection Assistant Attorney General O'Neill informed Plaintiff and the court that prison officials planned to relocate Plaintiff to the Hartford Correctional Center ("HCC") for trial. Plaintiff expressed concern that he would not have access to his belongings, including his legal material and the Assistant Attorney General representing the Defendants assured Plaintiff and the court that his belongings had been

1

transported.  [Dkt. 227 at 2.]  HCC is in the same city as the courthouse in which the trial was to be held, and is considerably closer than Corrigan-Radgowski Correctional Center, in which Plaintiff was housed leading up to trial.  It is customary for inmates to be relocated to a correctional facility close to the seat of court where their trial is being conducted.  Plaintiff was relocated to HCC after jury selection.

On January 5, 2017, the first day scheduled for the presentation of evidence, while the jury was waiting in the jury deliberation room, the court was informed that Plaintiff refused to enter the courtroom.  In an effort to placate Plaintiff, the court directed a judicial assistant to find Plaintiff in the courthouse hallway and offer him a blazer provided by the court to wear in front of the jury.  Plaintiff refused the gesture and refused to enter the courtroom.  The court then met with Plaintiff in the atrium to ask him to enter the courtroom and present his grievance.  The court recorded the interaction and immediately thereafter played the recording on the record.  The court's discourse with the Plaintiff was heated and unavailing.  Mr. Lewis was highly emotional, boisterous, and dismissive and stated his intent to file an appeal.  Below is a transcription of the colloquy:

> C: This is the first day of evidence in your trial.  I asked my assistant to come out and bring you a sports coat to offer you an opportunity to wear that during the trial and she tells me that you're not coming into the courtroom, is that correct?
> P: I don't have anything to say to you, Judge.  I don't have anything to say to you. [Unintelligible]
> C: You don't have to explain anything.  I just want to make sure you understand that you have the right not to go forward with your trial, but if you make that decision, then I am going to dismiss the case today.

**P: Do whatever you want, judge. But I'll tell you what. I'm not refusing to proceed with my trial. If you want to go into the court room, and have an ex parte, I'm happy to do that.**

**C: No, I don't care to have an ex parte about this. If you're not coming into the courtroom where the trial will be conducted, then you're declining to participate in your trial and therefore I will dismiss the case.**

**P: Yeah well, I'm sure the Second Circuit will wonder [unintelligible]. They will also wonder why I was transferred in the middle of jury selection and all my papers were confiscated – that I've been asking for since December. They will also wonder why the last three days I haven't had a shower haven't been given any of my clothes and my personal items have all been taken from me. They will also wonder why – about that.**

**C: So you're telling me that your materials –**

**P: -- the stuff that I left with on Tuesday –**

**C: -- from Corrigan were not transferred to Hartford?**

**P: No if you would listen, if you would listen for one minute. The stuff that I left with in the courtroom, that I had with me on Tuesday was confiscated when I was brought there, to Hartford. And the stuff I had in Corrigan, I was not allowed to access that. The last 42 hours . . . I haven't showered, any of my clothes. I'm not going in front of the court smelling like whatever, haven't had any sleep or anything like that.**

**C: Mr. Lewis, please come into the courtroom.**

**P: I'm not going in the courtroom.**

**C: Listen to me . . .**

**P: I'm not going in the courtroom.**

**C: Would you please listen to me.**

**P: I am listening but I'm not going in no courtroom.**

**C: Mr. Lewis, the jury is not in the courtroom.**

**P: I don't care who's in there. I'm not going in front of the court, after being up for two or three days without a shower.**

**C: Mr. Lewis, you are in front of the Court. I would like a formal record of this. I want to make it in front of Mr. O'Neill who, if you recall, on Tuesday indicated that he was going to make an effort to get you those things . . .**

**P: I don't care what he said. [unintelligible]**

**C: Mr. Lewis, I want to make a complete record.**

**P: You can make a complete record, but I'm telling you right now, I'm not playing any more games.**

**C: Come into the courtroom.**

**P: I'm not coming in the courtroom. I haven't had a shower since the last time I saw you. I haven't seen any of my papers. I'm not playing any more games.**

3

> C: I understand.  Mr. Lewis, I'm not asking you to appear before the jury today.  I'm asking you.
> P: I'm not appearing in front of nobody.
> C: Alright, well that's your choice.  If you want to resolve this, we can try to do that, but we have to deal with . . .
> P: [unintelligible] I asked you to intervene on this on Tuesday before Mr. O'Neil, and you let him handle it, and you see what happened.  I'm not playing any more games.
> C: He's not here.  He's in the courtroom.  We can make a record of what happened in the courtroom.
> P: You can make a record of whatever you want to make.  I'm done playing games.  The record will show all my papers was confiscated when I left here, I was transferred in the middle of jury selection.  The stuff I have at Corrigan I've been asking for since December 7.  What they tried to do is just drop it off . . . I haven't seen those papers since I left here.  All my trial papers were confiscated.  I want to talk to the FBI right now, file an obstruction of justice charge.  That's who I want to talk to.  I don't want to talk to no judge.  I want to file an obstruction of justice.  I want to talk to a federal agent. . . . If you want to drag me into the courtroom, I'm sure the press [members of which were present and attentive to the colloquy] would like that.  I'm just telling you, I haven't showered, I haven't brushed my teeth, I'm not going into any courtroom.  It's as simple as that.  It's as simple as that.  You can take it as defiance, but I did ask you to intervene about this, but you decided to refer it to the Attorney General. . . . he's complicit in it . . . I'm going to ask them to investigate that as well.
> C: Do you have anything else you would like to say?
> P: No, I don't.  I wish you would leave me alone.  That's all I have to say.
> D: I will do that.

[Dkt. 234.]

After this exchange, the court took the bench and played the recording into the record, noting that had Mr. Lewis come into the courtroom they could have perhaps come to a better understanding of what happened, found a way for him to access his materials, and proceeded with the trial later.  *Id*.  However, Plaintiff's refusal allowed the court no opportunity to determine any basis to continue the trial, and Plaintiff stated he had lost trust in the court and wanted to file an

4

appeal. Accordingly, the court dismissed the case without prejudice to a motion to reopen by February 9, 2017 stating good cause for Plaintiff's refusal to proceed with the trial. This was meant to allow the Plaintiff an opportunity to reconsider his position and demonstrate excusable neglect to prosecute his case. [Dkt. 224.]

On February 3, 2017, Mr. Lewis filed a timely motion to reopen the case in which he reiterated what he said on the first day of evidence when he refused to enter the courtroom. [Dkt. 227.] However, he did not explain why he refused to enter the courtroom and seek a continuance and failed to establish excusable neglect. *Id*. The court conducted a hearing at which Plaintiff offered additional reasons for his behavior discussed below.

    a. **Plaintiff's Account of the Events between January 3, 2017 Jury Selection and January 5, 2017 Trial**

In his timely Motion to Reopen, Plaintiff stated that during jury selection, he learned that defense counsel and persons from the Connecticut Department of Corrections had arranged for Plaintiff to be housed at Hartford Corrections Center ("HCC") for trial. [Dkt. 227 at 2.]

Upon arrival at Hartford Correctional at 6:30pm, Plaintiff's reading glasses and trial materials, including those he brought to jury selection and the remaining documents which were transferred directly from Corrigan, were in the possession of the admission and processing officer. *Id*. at 3. Plaintiff claims he requested access to his trial materials, reading glasses, and other property, but was ordered to report to his cell. *Id*. On January 4, 2017, Plaintiff claims he wrote a letter to the Warden at Hartford Correctional requesting immediate access to his trial materials. *Id*. at 4. On January 5, 2017, at around 6:50am, Plaintiff reported to the

5

admission and processing area to be transported to court for the first day of his trial. *Id*. Plaintiff claims he again requested access to his trial materials, reading glasses, and other property, but his request was denied. *Id*.

Plaintiff asserts defense counsel Assistant Attorney General O'Neill and persons from the Department of Corrections orchestrated Plaintiff's transfer to Hartford Correctional, the confiscation of his trial materials, reading glasses, and property, to prevent Plaintiff from presenting his case. *Id*. at 5.

    b. <u>Defendants' Account of the Events between January 3, 2017 Jury Selection and January 5, 2017 Trial</u>

Defendants filed an Objection to Plaintiff's Motion to Reopen Case on February 17, 2017. [Dkt. 231 ("Objection").] In their Objection, Defendants assert that on January 3, 2017, Deputy Warden Jeff Zegarzewski from Corrigan Correctional asked if Warden William Faneuff of the Hartford Correctional Center would accept transfer of Mr. Lewis for the duration of his trial. [Dkt. 231-1 (Affidavit of William Faneuff) ("Faneuff Aff.") at ¶ 4.] Defense counsel O'Neill learned of this during the course of jury selection that day. Objection at 1. That evening, Plaintiff arrived at Hartford Correctional with a clear plastic bag of accordion files containing legal work, approximately ten boxes of legal work and two boxes of personal property.[1] [Dkt. 231-1, Ex. 1 at 10[2] (Incident Report dated 1/03/2017 reviewing events of January 3 and 4, signed by Corrections Officer Santiago) ("Santiago Report"); Dkt. 231-1, Ex. 1 at 5 (Incident Report dated

---

[1] Leiutenant Archer reports Lewis arrived at Hartford Correctional with seven boxes of paperwork along with other property. [Dkt. 231-1, Ex. 1 at 9.]
[2] The Faneuff Affidavit and attached Exhibit is numbered continuously. Citations herein refer to the continuous pagination of the document as a whole.

6

1/05/2017 reviewing events of January 3 and 4, signed by Captain Timothy K. Newton) ("Newton Report").] At the hearing on the Motion to Reopen, Defendants offered testimony that Department of Corrections safety and security procedures dictate that the belongings of inmates transferred into a facility be search before they are allowed into the housing section of a facility, and Plaintiff acknowledged that this is true.

When Plaintiff arrived at Hartford Correctional, Property Officer E. Santiago "offered the inmate Lewis an opportunity with reasonable amount of time to retrieve what was pertinent to his current case and personal property (sic)." Santiago Report at 10. Lewis was allowed to take "one box with an empty box to his cell and go through it." Newton Report at 6. Plaintiff refused, stating he "needed one hour and a half to individually peer through every piece of legal paper work." Santiago Report at 10. Plaintiff "was adamant that he got all his property or none." Newton Report at 6. Officer Santiago contacted Lieutenant Archer, who offered to allow Plaintiff to take one or two boxes of legal work to his cell to sort through. [Dkt. 321-1, Ex. 1 at 9 (Incident Report dated January 5, 2017 reviewing events of January 3, signed by Lieutenant Shawn Archer) ("Archer Report").] Lieutenant Archer explained he property needed to be gone through by the Property Officer to ensure the safety and security of the Facility," and that Plaintiff "would have an opportunity the next day to go through his property because the Property Officer did not have an hour to go thr[ough] it at this time." *Id*. at 9. Plaintiff refused Lt. Archer's offer. Newton Report at 6; Archer Report at

7

9. At the hearing on the Motion to Reopen, a defense witness testified that there were eleven inmates transferring in and out of HCC when Plaintiff arrived.

Defendants contend that Mr. Lewis was not denied access to his reading material and personal items.  Officer Santiago reported that Plaintiff "was given multiple opportunities to receive personal property and legal contents and denied all attempts." *Id.* at 10.  The Property Officer on duty the following day, Officer T. Freel, stated no request was made to him on January 4, 2017 regarding Plaintiff's property.  [Dkt. 231-1, Ex. 1 at 18 (Incident Report dated 1/05/2017 reviewing events of January 5 signed by Correctional Officer Timothy Freel); Newton Report at 6.]   At approximately 2:00pm that day, Lewis reported to Correctional Counselor Ricco's office to retrieve an envelope of documents from defense counsel, and did not at that time express any "concerns or questions."  [Dkt. 231-1, Ex. 1 at 11 (Incident Report dated 1/04/2017 reviewing events of January 4 signed by Correctional Counselor R. Ricco).]  Officer Santiago was on duty the evening of January 4, 2017, went to Plaintiff's cell and "offered inmate Lewis an opportunity with reasonable amount of time to retrieve what was pertinent to his current case and personal property."  Santiago Report at 10.  Plaintiff again refused and stated "he needed one hour and a half to look through all approximately 10 boxes of legal paper work." *Id.* at 10.

Defendants also contend Mr. Lewis refused opportunities to attend to his personal hygiene.  During the day on January 4, 2017, "inmates in Lewis' housing unit had 3 opportunities to take a shower during each of the 3 1 hour recreation periods that day.  If Lewis failed to shower that day, it was his own choice to do

8

so." Faneuff Aff. At ¶ 14.  At approximately 4:00am on January 5, 2017, the first day of trial, Correctional Officer Lisa Lawrence informed Plaintiff he needed to get up and ready for court.  [Dkt. 231-1, Ex. 1 at 17 (Incident Report dated 1/05/2017 reviewing events of January 5 signed by Correctional Officer Lisa Lawrence).] Plaintiff "did not ask to shower at this time or during subsequent tours." *Id*.  At approximately 6:15am, Correctional Officer Michael McDonald "offered [Plaintiff] the opportunity to shower."  [Dkt. 231-1, Ex. 1 at 16 (Incident Report dated 1/05/2017 reviewing events of January 5 signed by Correctional Officer Michael McDonald); Newton Report at 6.]

   c. <u>The Hearing on the Motion to Reopen</u>

The court held a two-day hearing on the Motion to Reopen, on September 12, 2017 and October 30, 2017.  On the first day, Plaintiff questioned Warden William Faneuff and correctional counsellor Kimberly Daly.  [Dkt. 263 (audio recording of 9/13/2017 hearing).]  Attorney O'Neill cross examined Warden Faneuff and declined to cross examine Ms. Daly. *Id.*  Both witnesses' testimony concerned the procedure for storing inmate property, the procedure for processing inmate grievances, and the steps taken to investigate Plaintiff's grievance regarding the handling of his property at HCC on January 3, 2017. *Id*. The court then adjourned for the day. *Id*.

On the second hearing date, the court emphasized to Plaintiff that the only question at issue was why Plaintiff refused to enter the courtroom on January 5, 2017 to request a continuance of his trial, forcing the court to dismiss his case for

failure to prosecute.  Dkt. 284 (audio recording of 10/30 hearing).]  Plaintiff responded by giving his own testimony:

> When I got to Hartford, [my glasses were] confiscated as part of me being admitted, and they [weren't] given back to me. . . . During that time, from the last time I saw you on the third [of January] to the next time I saw you in the foyer [of the courthouse], . . . two days had elapsed.  At that point your honor, I had been up for . . . two days without sleep because of insomnia.  I believe it was due to the treatment that I received upon my arrival.  Not having access to the stuff that I needed.  In particular the glasses and other stuff that I needed that was part of my trial preparation.  And also, basic things that any person would need when they're inside of a cell, such as soap, toothpaste, and what have you.
>
> The only reason, logical reason I could give you . . . If I could offer my state of mind to you, when I talked to you in the foyer judge . . . I was in a state of shock, and basically couldn't believe what was going on. . . . And the feelings that I was feeling at that time, they brought back all of the memories that I had 8 years ago when I was on trial, when I couldn't see without my eyeglasses.  It brought back all those feelings, and it made me not able to think clearly or ask the right questions, I would say.  I didn't have any idea what was going to happen after that.  All I knew was that there was no way that I could proceed without my eyeglasses and without my documents. . . .
>
> I'm going to be honest with you, I panic without my glasses, because the only way I can . . . advocate for myself, is I've got to be able to see what I'm reading. . . .
>
> [My refusal to go into the courtroom] had to do with being up for two days and the state of mind that I was in from the last time I'd seen you on the third to when I [saw] you on the [fifth].  [I was] in a cell, pacing, with nothing, no hygiene items, nothing.  Just bed sheets. . . . When I talked to you on the fifth, I was in a state of shock about what had happened to me. . . . I've been transferred seven times, and the reason why I'm bringing this up, your honor, is that I know what the policy is when I'm admitted to a facility . . . I would never have demanded to have ten boxes in my cell. . . . I wanted the access that I would have in any other facility that I'm transferred to.  I would want to have my hygiene items.  I would want to have my writing instruments. . . . The treatment [I received] shocked my conscience . . . to a point that I was like "I can't believe this."  . . .

10

> **So when I [saw] you judge, my mind state, I can't say it was rational. . . . I didn't know you [were] going to let me ask for a motion for a continuance . . . all I knew was I had been up for two days, I was transferred in the middle of my trial . . . . The word I would use is flabbergasted. I was in shock. . . . But it wasn't to delay, it wasn't to waste the Court's time. I couldn't see beyond the circumstances that I didn't create for myself. . . . I couldn't proceed in a right state of mind. . . .**
>
> **On December 7, 2016, . . . I wrote a request to the property officer at Corrigan. . . . It was established that I wasn't allowed to get access to that legal work until January 23 . . . approximately three weeks after this case was dismissed. . . . It was an ongoing problem but it didn't become an emergency shocking my conscience until all of the events happened after that. The catalyst is when [Attorney O'Neill] notified me that I was being transferred, and when I saw all of the officers here [with] the documents . . . that I had been asking for for months. . . . It may not have seemed serious judge, when we [were] at the sidebar [during jury selection discussing Plaintiff's transfer]. It was serious, but it wasn't an emergency until they did what they did. Until I got to Hartford, where they wouldn't let me have none of my stuff. . . . It wasn't an emergency . . . until I realized what was going on. . . . After I met with you [on January third], I was in a good state of mind at the jury [selection]. I was ready to present evidence. But when I [saw] what was unfolding . . . I was shocked . . .**
>
> **I'm kind of stubborn by nature, so when I make up my mind about something, it doesn't change. . . . I know myself. I'm almost 50 now and I know myself. I know when I can do something and when I can't do something. I know when I can go inside a courtroom and present a case, and when I can't. . . . All I know is what I was thinking at the time, is I was in shock. . . . The only thing I was hearing was . . . 'if you don't proceed, I'm going to have to dismiss your case.' And I was like, 'well judge, I don't have any of my documents. I can't proceed. Do whatever you want.'**

[Dkt. 284.]

In addition to Plaintiff's testimony, Defendants offered testimony from Corrections Officer Santiago, who was in charge of property intake at HCC on January 3, 2017, and Lieutenant Sean Archer, Officer Santiago's supervisor at HCC. Both witnesses recounted their discussions with Plaintiff from January 3, 2017 to

11

**January 5, 2017, and both testified that Plaintiff asserted he would accept none of his property if he could not have all of his property.**

**II.     Statement of Law**

**"On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b)(1). In deciding a Rule 60(b) motion, a court must balance the policy in favor of hearing a litigant's claims on the merits against the policy in favor of finality. *Kotlicky v. U.S. Fid. & Guar. Co.*, 817 F.2d 6, 9 (2d Cir. 1987).** "**Generally, courts require that the evidence in support of the motion to vacate a final judgment be highly convincing, that a party show good cause for the failure to act sooner, and that no undue hardship be imposed on other parties." *Id.* at 9 (internal citations omitted).**

**Courts consider "all relevant circumstances" when determining whether to vacate a final judgment, which may include the potential for prejudice to the adversary, the length of the delay, the reason for the error, the potential impact on the judicial proceedings, whether the circumstances creating the delay were within the reasonable control of the movant, and whether the movant acted in good faith. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993). Generally, excusable neglect encompasses "inadvertence, carelessness, and mistake." *Carcello v. TJX Co.*, 192 F.R.D. 61, 64 (D. Conn. 2000). A litigant's pro se status does not, on its own, satisfy any of the**

requirements of Rule 60(b). *Parker v. City of N.Y.*, No. 05 CIV. 0101, 2009 WL 3754197, at *3 (S.D.N.Y. Nov. 6, 2009).

III. <u>Analysis</u>

As the Court stated at the October 30, 2017 hearing, the key issue is whether Plaintiff's failure to enter the courtroom on January 5, 2017 to request a continuance was excusable neglect. The Court finds the HCC staff who testified at the hearing highly credible, and finds that they did not mistreat Plaintiff or unreasonably deny him access to his legal material and personal belongings from January 3, 2017 to January 5, 2017. Notwithstanding, Plaintiff has established excusable neglect.

On January 3, 2017, Mr. Lewis was under the pressure of having to proceed with trial in two days. He was "shocked" by his transfer and inability to have all of his material immediately upon entering HCC. The court credits Mr. Lewis' account that he "panicked" when he was told he was being transferred and his panic escalated when he was told he could not have his glasses and legal material immediately. He was in a heightened emotional state which did not allow him to think clearly enough to accept the offers made to him at HCC. In the succeeding days he became intractably "stubborn" and was so overwrought up by the time he returned to court on January 5 that he was both unprepared for trial and emotionally unable to appreciate what the court was saying to him.

A pro se plaintiff's anxiety may excuse his inability to litigate his case. For example, in *Leftridge v. Ct. State Trooper Officer No. 1283*, 640 F.3d 62, 68 (2d Cir. 2011), the plaintiff asserted he could not proceed with his case absent

13

appointment of counsel because the task of representing himself was causing him "inordinate anxiety and stress." Id. at 65. After plaintiff repeatedly asserted his anxiety and stress prevented him from proceeding without counsel, the district court administratively closed the case without prejudice to plaintiff moving to reopen upon securing counsel. Id. When plaintiff sought to reopen the case without counsel, the request was denied as plaintiff had not demonstrated a change in circumstances or otherwise convinced the court that he was capable of proceeding at that time. Id. The plaintiff appealed and the Second Circuit found that far from failing to prosecute his case, plaintiff had engaged in "voluminous" motions practice despite his asserted anxiety. Id. The court also found that plaintiff's multiple requests for counsel "did not necessarily mean that [plaintiff] would choose not to proceed *pro se* if that choice would result in dismissal." Id. Given plaintiff's demonstrated desire and ability to prosecute the case, and his apparent unawareness that his actions would result in dismissal, the court ordered the case to be reopened. Id.

By contrast, the Second Circuit declined to excuse a pro se plaintiff's delay in *Boos v. Runyon*, 201 F.3d 178, 184-85 (2d Cir. 2000). In *Boos*, the plaintiff asserted she was unable to meet litigation deadlines because of her "paranoia, panic attacks, and depression." Id. The Second Circuit found that, without an explanation of how plaintiff's condition adversely affected her ability to timely pursue her claims, her bare allegation of panic was insufficient to excuse her delay. Id. The court also noted that the plaintiff had failed to abide by court orders both before and after the onset of her alleged condition, which

14

undermined the plaintiff's argument.  *Id*.  Likewise, the Eastern District of New York found a pro se plaintiff's "depressed and anxious mood, . . . difficulty concentrating, [and] trouble sleeping" did not excuse the plaintiff's "history of noncompliance with the court's orders" since the plaintiff did not "indicate the extent or effect of any of those limitations on the plaintiff's ability to respond to discovery requests or comply with the court's orders."  *DePietro v. City of N.Y.*, No. 09-cv-932, 2012 WL 6061132, at *5 (E.D.N.Y. Dec. 6, 2012).

This case does not suffer from the shortcomings in *Boos* and *DePietro*.  Here, Plaintiff did not merely assert that anxiety prevented him from seeking a continuance of his trial.  Rather, Plaintiff testified at length as to the impact his emotional and mental state had on his ability to proceed.  [Dkt. 284.]  Plaintiff recounted his prior experience litigating a case without eyeglasses, and stated the prospect of facing another trial without his glasses "stirred up a lot of past trauma" and made him "not able to think clearly or ask the right questions."  *Id*.  Plaintiff explained that his "panic," "shock" and related "insomnia" made him irrational, and left him unable to understand that he had the option of moving for a continuance.  *Id*.  Plaintiff asserted he misunderstood the court to be giving him an ultimatum, by which he would either proceed with his trial without his litigation materials and eyeglasses or his case would be dismissed.  *Id*.  In a state of "panic" and "shock," and feeling he could not proceed without his documents or glasses, Plaintiff told the court to "do whatever you want."  *Id*.  Plaintiff clearly connected his mental and emotional state to his inability to move forward.

In addition, as in *Leftridge*, Plaintiff has demonstrated a resumption of his litigation zeal, manifesting a willingness and ability to proceed with his case. Plaintiff moved to reopen this case and participated in a two-day hearing on the motion.  Prior to dismissal, Plaintiff filed numerous motions for discovery and trial memoranda for two different trial dates over the course of this five-year litigation on a docket with 284 docket entries.  Plaintiff has demonstrated that, had he had the emotional and mental capacity, he would have chosen to request a continuance rather than concede to dismissal of his case.

Plaintiff has given "highly convincing" evidence in support of his motion to reopen and has shown "good cause" for failing to move for a continuance on January 5, 2017.  *See Kotlicky*, 817 F.2d at 9.  In addition, Defendants will suffer no undue hardship as a result of reopening the case.  *Id.* at 9; *see also Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1987) ("[D]elay alone is not sufficient for establishing prejudice" without a showing that the delay will "result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion.").  Here, many of the facts at issue are documented in DOC records and the witnesses have repeatedly been called upon to testify and thus have had their memories refreshed over the years.  Finally, Defendants have not asserted or offered any facts suggesting they would be prejudiced by reopening the case.   The relevant circumstances weigh in favor of reopening so this case may be decided on the merits.

IV. **Conclusion**

For the foregoing reasons, Plaintiff's Motion to Reopen Case is GRANTED. The Court is aware that Plaintiff may require time to secure his legal materials from storage and prepare for trial. Defendants are ordered to give Plaintiff prompt access to his legal material and glasses not later than sixty (60) days after the date of this order. Trial is scheduled for May 1, 2018. The trial memorandum in accordance with the Court's standing order is due not later than March 16, 2018.

                                            IT IS SO ORDERED

                                            _____/s/_____

                                            Vanessa L. Bryant,
                                            United States District Judge