KACEY LEWIS,                 :
     Plaintiff,             :
                         :        CIVIL ACTION NO.
v.                        :        3:12-cv-1070 (VLB)
                         :
DR. MARK FRAYNE, DR. ROBERT   :        May 15, 2018
BERGER, AND DR. GERARD GAGNE, :
     Defendants.           :

## MEMORANDUM OF DECISION DISMISSING CASE

Under consideration by the court is dismissal of this case under Federal Rule of Civil Procedure 41(b).  As discussed below, the court considers whether the case should be dismissed under two standards.  First, the court considers the "substantial justification" standard outlined in *Lewis v. Rawson*, 564 F.3d 569 (2d Cir. 2009) which states the standard for dismissal when a plaintiff refuses to go forward with a duly scheduled trial.  Second, the court considers dismissal under the standard applicable when a party fails to go forward with trial announced in *Drake v. Norden Systems, Inc.*, 375 F.3d 248 (2d Cir. 2004).  The facts currently before the court weigh in favor of dismissal under either standard.  Under either of these standards the conduct of the Plaintiff warrants dismissal and accordingly the case is DISMISSED.

## I.   Procedural Background

The court begins with a brief procedural history of the case helpful in understanding the ultimate ruling.  Plaintiff Kacey Lewis ("Plaintiff" or "Lewis"), an inmate in the Cheshire Correctional Institution, proceeding *pro se*, brings Eighth Amendment deliberate indifference and Fourteenth Amendment due

process claims against Defendants Mark Frayne ("Frayne"), Robert Berger ("Berger"), and Gerard Gagne ("Gagne"), doctors at Northern Correctional Institution ("Northern"), in connection with the involuntary administration of psychotropic medication. Throughout this case, Plaintiff has asserted that he does not suffer from a mental illness and that Defendant's violated his constitutional rights by forcibly medicating him to prevent him from pursuing a suit in the Connecticut Superior Court, challenging the criminal conviction for which he is detained.

Plaintiff first brought his Complaint in this action on July 20, 2012. [Dkt. 1.] The case was inactive for months and the parties failed to comply with the first Scheduling Order [Dkt. 17]; accordingly the court ordered Plaintiff to show cause why the case should not be dismissed by February 14, 2014. [Dkt. 23.] Plaintiff "demonstrated no good cause for his failure to diligently prosecute this case," and the court dismissed the action on February 20, 2014. [Dkt. 25.] Plaintiff moved for reconsideration of the dismissal [Dkt. 26], the court denied reconsideration [Dkt. 27], Plaintiff appealed the decision [Dkt. 28], and the Second Circuit vacated the dismissal and remanded for further proceedings on December 16, 2014. [Dkt. 30.] The court entered its first Amended Scheduling Order on December 19, 2014, setting jury selection for November 3, 2015. [Dkt. 31.] On February 23, 2015, Plaintiff filed his Amended Complaint. [Dkt. 34.]

Plaintiff moved to appoint counsel on March 16, 2015 [Dkt. 37], and the court granted that motion [Dkt. 39]. Attorney Dan LaBelle appeared to represent Plaintiff on May 26, 2015. [Dkt. 45.] Plaintiff's counsel moved to continue trial for

the first time on October 1, 2015, citing his recent appointment as pro bono counsel, the need to file an amended pleading, and the need for limited discovery. [Dkt. 51.] The court granted the motion and rescheduled all deadlines including jury selection, now to take place on March 31, 2016. [Dkt. 53.]

On December 15, 2015, Plaintiff moved to remove Mr. LaBelle as counsel as "the attorney-client relationship has broken down." [Dkt. 54.] Plaintiff requested to represent himself. *Id.* Mr. LaBelle agreed with the statement, explaining his late appointment to the case, the need for additional time to complete discovery and prepare for trial leading to his motion for a continuance, and recounting a meeting with Plaintiff where he presented Plaintiff a full set of discovery materials. [Dkt. 55.] Plaintiff did not accept the discovery materials, stated he wished to proceed pro se, and abruptly ended the meeting. *Id.* The court referred the matter to Magistrate Judge Margolis, who "urge[d] plaintiff to reconsider his motion." [Dkt. 58.] Rather than heed Magistrate Judge Margolis' advice, Plaintiff filed a Motion for Judicial Recusal stating Judge Bryant "has showed bias and prejudice against the Plaintiff in prior judicial proceedings," and citing the Court's disqualification of a certain juror in a criminal case involving Lewis in 1999 in Connecticut Superior Court. [Dkt. 59.] The court denied the Motion for Recusal and granted the Motion to Withdraw as Counsel. [Dkt. 61.]

The court granted Plaintiff's Motion to File a Second Amended Complaint on February 10, 2016 [Dkt. 72] and, because of the amendment, rendered a Second Amended Scheduling Order resetting all deadlines including the jury selection date, now set for June 30, 2016. [Dkt. 73.]

Plaintiff submitted a flurry of motions in late April and early May of 2016, including a motion for Summary Judgment [Dkt. 93, dated April 19, 2016], motion to compel production of certain documents including prison video recordings and movement logs [Dkt. 97, dated April 22, 2016], motion to sanction opposing counsel for making the allegedly untrue statement that Plaintiff stated he was "involuntarily medicated for psychiatric disorders" (Plaintiff asserts he has never admitted to having psychiatric disorders) [Dkt. 96, dated April 22, 2016], and motion for permission to file a separate trial memorandum since he would not likely be able to confer with opposing counsel as a pro se prisoner [Dkt. 98, dated May 6, 2016]. Defendants responded to all motions and filed their own Joint Trial Memorandum on June 1, 2016. [Dkt. 107.] The court granted Plaintiff's Motion for Leave to File Separate Trial Memorandum [Dkt. 112], denied Plaintiff's Motion for Sanctions because defense counsel's allegedly incorrect statement was consistent with Plaintiff's own allegations and, even if incorrect, would not have warranted sanctions [Dkt. 113] and denied Plaintiff's Motion to Compel for failure to establish Defendants improperly withheld any discovery [*id.*].

Confronted with Mr. Lewis' refusal to confer with defense counsel and file a joint trial memorandum, the court made a significant concession in an effort to assure that the trial would go forward as scheduled. The court deviated from its standard practice outlined in its Chambers Practices, which requires parties to meet and confer to discuss the conduct of the trial and file a joint trial memorandum. Under Chambers Practices, the joint trial memorandum must include a joint statement of the case and a list of witnesses, including the

anticipated subjects and duration of witness testimony. This information helps the court to determine the time necessary to try the case, empanel a jury, and manage its docket on which several cases are scheduled for trial each month.

On June 6, 2016, after having entered several prior scheduling orders, the court scheduled jury selection for July 1, 2016 [Dkt. 110] and trial to begin July 22, 2016. [Dkt. 108.] On June 16, 2016, Plaintiff requested an extension of time to file his Trial Memorandum [Dkt. 118], which the court granted [Dkt. 121]. As a result, the court postponed the July 2016 jury selection and trial dates. [Dkt. 122.] Plaintiff also moved to strike Defendants' Trial Memorandum "because the Defendants failed to seek permission from the court to file a separate trial brief," despite the fact that Plaintiff insisted that the parties file separate briefs. [Dkt. 119]. Plaintiff's motion to strike was denied, as Defendants sufficiently explained why they could not file a trial memorandum jointly with Plaintiff. [Dkt. 121.]

On June 28, 2016, Plaintiff filed his trial memorandum. [Dkt. 127.] On July 18, 2016, Plaintiff moved to reopen discovery in order to respond to Defendants' Supplemental Motion in Opposition to Plaintiff's Motion for Summary Judgment. [Dkt. 133.] That same day, the court granted in part and denied in part Plaintiff's Motion for Summary Judgment, allowing trial to proceed as to liability and damages for Plaintiff's Eighth Amendment claim and solely with respect to damages on his Fourteenth Amendment claim. [Dkt. 139.] On July 19, 2016, the court denied Plaintiff's Motion to Reopen Discovery as moot given the court's summary judgment decision, and given that the Defendant's supplemental

briefing to which Plaintiff sought to respond concerned only issues of law not requiring further discovery.  [Dkt. 142.]

Contemporaneous with Plaintiff's Motion to Reopen Discovery, Plaintiff moved to appoint an expert witness to opine about "diagnosis and treating mental illness" and "the side-effects of antipsychotic, neuroleptic drugs [and] psychotropic drugs."  [Dkt. 134.]  The court granted Plaintiff's request and provided Plaintiff with a list of medical professionals supplied by the Connecticut Medical Society, along with their contact information, and awarded Plaintiff up to $1,000 to compensate any expert retained for records review and interview.[1]  [Dkt. 149.]  The court stated it would consider approving additional funds for additional services upon review of the initial records review and interview.  *Id.* To date, Plaintiff has not availed himself of this prosecutorial tool.

Defendants moved to continue the Final Pretrial Conference, initially scheduled for July 28, 2016 [Dkt. 143], and on July 27, 2016 the court rescheduled said conference for December 7, 2016.  [Dkt. 153.]  That same day, the court set the Final Scheduling Order scheduling jury selection for January 3, 2017.  [Dkt. 156.]  Defendants moved to continue the Pretrial Conference on December 5, 2016 due to a medical issue.  [Dkt. 195.]  The court granted the motion and continued the Pretrial Conference to December 15, 2016.  [Dkt. 196.]

---

[1] At a pretrial conference on December 15, 2016, Plaintiff notified the court he was unable to secure an expert for trial, despite writing letters to approximately 40 experts including those recommended by the court.  *Id.*  The court expressed disappointment for the Plaintiff but explained that medical experts usually charge much more per hour for service in a litigation than the court was able to provide the Plaintiff.  *Id.*

The Pretrial Conference lasted 50 minutes. At the hearing, the court and Plaintiff discussed various pretrial matters, including Plaintiff's general preparedness to argue his case pro se without an expert, particularly in view of the fact that the critical issue in the case was whether Plaintiff suffered from a mental illness which required him to be medicated.

At the hearing, Plaintiff also demanded that he receive court filings directly from the court rather than through the prison litigation system like all other inmates. [Dkt. 199.] Plaintiff represented that officials at Corrigan, where he was housed, were not giving him electronic court filings in a timely manner, and as a result Plaintiff claimed he did not learn he had a court proceeding until an hour before the hearing began. *Id.* This district has a memorandum of understanding with the Connecticut Department of Corrections under which the Department has agreed to deliver to inmates with cases pending in our district all court filings, including docket entries. The clerk of the court reported that these cases comprised 19.61 percent of the district's pending civil caseload at the end of 2017. The court asked the courtroom deputy to state for the record what notices Plaintiff should have received with respect to the December 15, 2016 hearing. *Id.* The courtroom deputy stated the pretrial hearing was originally scheduled on July 27, 2017 for December 7, notice was given to the prison through PRISSCAN, and Plaintiff should have been notified at that time. The hearing was continued on December 6 and notice was provided to Corrigan and should have been provided to Plaintiff at that time as well. *Id.* The court asked if Plaintiff received notice in July of the December pretrial hearing. *Id.* Plaintiff stated he did not

receive the July notice, and he was at a different prison facility at that time, and he definitely did not receive the December notice of continuance. *Id.* The court directed the clerk to physically mail the Plaintiff all court orders and ordered defense counsel to mail Plaintiff everything the defense filed on the docket. *Id.* The court made this additional concession to appease Plaintiff despite the fact that no other inmate has informed this court that he did not receive a court filing from the Department of corrections as provided in the memorandum of understanding.

At the hearing, Mr. Lewis also insisted on filing his jury instructions late, in contravention of the court's orders, and refused to proceed when his request was denied. Specifically, the court denied Plaintiff's request to file jury instructions during the trial rather than with the trial memorandum in accordance with Chambers Practices. [Dkt. 199.] The court explained jury instructions and other trial materials must be filed in advance of trial in order to allow the court sufficient time to consider them. *Id.* Plaintiff responded that he understood the court's June Order as stating Plaintiff did not need to file a trial memorandum because he was proceeding pro se. *Id.* The court explained the earlier Order stated Plaintiff was not required to file a *joint* trial memorandum with Defendants because he had previously refused. *Id.* (referencing Dkt. 112). The court further emphasized that the allowance to file his own trial memorandum did not award Plaintiff the right to file portions of the trial memorandum seven months after the trial memorandum deadline on the eve of trial or during trial. *Id.* The Plaintiff requested an exception, stating Defendants gave Plaintiff certain trial materials

after the trial memorandum deadline.  *Id.*  The court asked defense counsel to recount the timing of his discovery productions.  *Id.*  Defense counsel responded that he went to the facility where Plaintiff was housed before the Joint Trial Memorandum deadline over the summer but Plaintiff refused to see defense counsel or accept the defense's portion of the joint trial memorandum.  *Id.*  Defense counsel then filed Defendants' own trial memorandum on the docket and sent those materials to Plaintiff after the trial memorandum deadline.  *Id.*  As defense counsel began this explanation, Plaintiff disrupted the proceedings, abruptly exited the Pretrial Conference, and shouted at the court: "I'm finished with your hearing.  It's on the record that I objected to it.  You can make whatever rulings you want to make, Judge, and I'll file my appeals as they're appropriate."  *Id.*  The court informed the Plaintiff that he was not required to remain in the courtroom, after which the Plaintiff abruptly left the courtroom in a loud and disruptive manner.  *Id.*  As he exited he veered toward defense counsel, in a menacing manner and shouted "You're gonna [sic] lose this case."  *Id.*

Plaintiff filed proposed jury instructions on December 22, 2016.  [Dkt. 206.] Just five days later, on December 27, 2016, Plaintiff moved to continue the January jury selection and trial dates as his subpoenas for potential witnesses had not yet been served by the U.S. Marshal's Office.  [Dkt. 208.]  The Plaintiff had no basis to know whether his subpoenas had or had not been served.  The court denied the request for continuance, stating that there was ample time to serve the subpoenas.  [Dkt. 219.]  However, to allay Plaintiff's concerns and avert another

barrage of filings, the court entered a superfluous order directing the U.S. Marshal's Office to promptly serve Plaintiff's subpoenas. [Dkt. 219.]

Jury selection took place on January 3, 2017 and took three hours and 52 minutes. [Dkt. 221.] That same day, the parties attended a one hour and ten minute settlement conference with Magistrate Judge Richardson which did not lead to settlement. [Dkt. 222.] After jury selection Assistant Attorney General O'Neill informed Plaintiff and the court that prison officials planned to relocate Plaintiff to the Hartford Correctional Center ("HCC") for trial. Plaintiff expressed concern that he would not have access to his belongings, including his legal material and the Assistant Attorney General representing the Defendants assured Plaintiff and the court that his belongings had been transported. [Dkt. 227 at 2.] HCC is in the same city as the courthouse in which the trial was to be held, and is considerably closer than Corrigan-Radgowski Correctional Center, in which Plaintiff was housed leading up to trial. It is customary for inmates to be relocated to a correctional facility close to the seat of court where their trial is being conducted. Plaintiff was relocated to HCC after jury selection. Department of Corrections Administrative Directive 60.10 requires that all inmate property be searched and inventoried before upon arrival at a facility. http://portal.ct.gov/DOC/AD/AD-Chapter-6.

On January 5, 2017, the first day scheduled for the presentation of evidence, while the jury was waiting in the jury deliberation room, the court was informed that Plaintiff refused to enter the courtroom. In an effort to placate Plaintiff, the court directed a judicial assistant to find Plaintiff in the courthouse

hallway and offer him a blazer provided by the court to wear in front of the jury. Plaintiff refused the gesture and refused to enter the courtroom. The court then met with Plaintiff in the atrium to ask him to enter the courtroom and present his grievance. The court's efforts were unavailing. Mr. Lewis was agitated, boisterous, and disrespectful towards the court. He refused to enter the courtroom and stated his intent to file an appeal. The court recorded the interaction and immediately thereafter played the recording on the record. Below is a transcription of the colloquy:

C: This is the first day of evidence in your trial. I asked my assistant to come out and bring you a sports coat to offer you an opportunity to wear that during the trial and she tells me that you're not coming into the courtroom, is that correct?

P: I don't have anything to say to you, Judge. I don't have anything to say to you. [Unintelligible]

C: You don't have to explain anything. I just want to make sure you understand that you have the right not to go forward with your trial, but if you make that decision, then I am going to dismiss the case today.

P: Do whatever you want, judge. But I'll tell you what. I'm not refusing to proceed with my trial. If you want to go into the court room, and have an ex parte, I'm happy to do that.

C: No, I don't care to have an ex parte about this. If you're not coming into the courtroom where the trial will be conducted, then you're declining to participate in your trial and therefore I will dismiss the case.

P: Yeah well, I'm sure the Second Circuit will wonder [unintelligible]. They will also wonder why I was transferred in the middle of jury selection and all my papers were confiscated – that I've been asking for since December. They will also wonder why the last three days I haven't had a shower haven't been given any of my clothes and my personal items have all been taken from me. They will also wonder why – about that.

C: So you're telling me that your materials –

P: -- the stuff that I left with on Tuesday –

C: -- from Corrigan were not transferred to Hartford?

P: No if you would listen, if you would listen for one minute. The stuff that I left with in the courtroom that I had with me on Tuesday was confiscated when I was brought there, to Hartford. And the stuff I

had in Corrigan, I was not allowed to access that. The last 42 hours . . . I haven't showered, any of my clothes. I'm not going in front of the court smelling like whatever, haven't had any sleep or anything like that.

C: Mr. Lewis, please come into the courtroom.

P: I'm not going in the courtroom.

C: Listen to me . . .

P: I'm not going in the courtroom.

C: Would you please listen to me.

P: I am listening but I'm not going in no courtroom.

C: Mr. Lewis, the jury is not in the courtroom.

P: I don't care who's in there. I'm not going in front of the court, after being up for two or three days without a shower.

C: Mr. Lewis, you are in front of the Court. I would like a formal record of this. I want to make it in front of Mr. O'Neill who, if you recall, on Tuesday indicated that he was going to make an effort to get you those things . . .

P: I don't care what he said. [unintelligible]

C: Mr. Lewis, I want to make a complete record.

P: You can make a complete record, but I'm telling you right now, I'm not playing any more games.

C: Come into the courtroom.

P: I'm not coming in the courtroom. I haven't had a shower since the last time I saw you. I haven't seen any of my papers. I'm not playing any more games.

C: I understand. Mr. Lewis, I'm not asking you to appear before the jury today. I'm asking you.

P: I'm not appearing in front of nobody.

C: Alright, well that's your choice. If you want to resolve this, we can try to do that, but we have to deal with . . .

P: [unintelligible] I asked you to intervene on this on Tuesday before Mr. O'Neil, and you let him handle it, and you see what happened. I'm not playing any more games.

C: He's not here. He's in the courtroom. We can make a record of what happened in the courtroom.

P: You can make a record of whatever you want to make. I'm done playing games. The record will show all my papers was confiscated when I left here, I was transferred in the middle of jury selection. The stuff I have at Corrigan I've been asking for since December 7. What they tried to do is just drop it off . . . I haven't seen those papers since I left here. All my trial papers were confiscated. I want to talk to the FBI right now, file an obstruction of justice charge. That's who I want to talk to. I don't want to talk to no judge. I want to file an obstruction of justice. I want to talk to a federal agent. . . . If you want to drag me into the courtroom, I'm sure the press [members of which were present and attentive

to the colloquy] would like that.  I'm just telling you, I haven't showered, I haven't brushed my teeth, I'm not going into any courtroom.  It's as simple as that.  It's as simple as that.  You can take it as defiance, but I did ask you to intervene about this, but you decided to refer it to the Attorney General. . . . he's complicit in it . . . I'm going to ask them to investigate that as well.

C: Do you have anything else you would like to say?

P: No, I don't.  I wish you would leave me alone.  That's all I have to say.

D: I will do that.

[Dkt. 234.]

After this exchange, the court took the bench and played the recording into the record, noting that had Mr. Lewis come into the courtroom they could have perhaps come to a better understanding of what happened, found a way for him to access his materials, and proceeded with the trial later.  *Id.*  However, Plaintiff's refusal allowed the court no opportunity to determine any basis to continue the trial, and Plaintiff stated he had lost trust in the court and wanted to file an appeal.  Accordingly, the court dismissed the case without prejudice to a motion to reopen by February 9, 2017 stating good cause for Plaintiff's refusal to proceed with the trial.  This was meant to allow the Plaintiff an opportunity to reconsider his position and demonstrate excusable neglect to prosecute his case.  [Dkt. 224.]

On February 3, 2017, Mr. Lewis filed a timely motion to reopen the case in which he reiterated what he said on the first day of evidence when he refused to enter the courtroom.  [Dkt. 227.]  *Id.*  The court held a two-day hearing on the Motion to Reopen, on September 12, 2017 and October 30, 2017.  On the first and much of the second day, Plaintiff persisted in insisting falsely that he was deprived of his legal material and use of the bathing facilities.  Only after the court repeatedly explained the standard of review did Mr. Lewis finally admit that

his material was not denied him, but that he refused to cooperate with officials to obtain them. Plaintiff explained that he was "shocked" by his transfer and inability to have all of his material immediately upon entering HCC. The court credited Mr. Lewis' account that he "panicked" when he was told he was being transferred and his panic escalated when he was told he could not have his glasses and legal material immediately. His extremely heightened emotional state prevented him from thinking clearly enough to accept the offers made to him at HCC.

In the succeeding days, Plaintiff became intractably "stubborn" and was so overwrought up by the time he returned to court on January 5 that he was both unprepared for trial and emotionally unable to appreciate what the court was saying to him. In light of Plaintiff's testimony, mindful of the Second Circuit's preference for matters to be decided on the merits and the deference to be accorded to *pro se* litigants, the court reopened Plaintiff's case on November 16, 2017 and set a new trial date of May 1, 2018. [Dkt. 286.]

On February 7, 2018, Mr. Lewis resumed his dilatory litigation practices. He moved for an order to find Defendants in contempt for failing to give him access to his legal materials. [Dkt. 288.] Defendants responded that they made an appointment in November for Plaintiff to review his legal materials, but Plaintiff failed to appear for his appointment and failed to request to review his legal materials at any point after that. [Dkt. 290.] After Plaintiff filed his motion for contempt, Defendants again arranged for Plaintiff to review his property and he

did so on February 20, 2018.  *Id.*  The court found Plaintiff's motion moot.  [Dkt. 293.]

Plaintiff filed another in a persistent series of meritless motions for reconsideration, in which he did not deny that he received access to his legal materials on February 20, 2018.  [Dkt. 295.]  The court denied the motion for reconsideration for failure to meet the reconsideration standard, articulating the standard which it articulated on numerous prior occasions in Orders denying his prior motions for reconsideration.  The court counseled once again that Plaintiff was required, and failed, to cite an intervening change in law, the availability of new evidence, or the need to prevent manifest injustice which would result from the failure to reconsider the court's ruling.  [Dkt. 296 (citing *Shrader v. CSX Transp. Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (stating the reconsideration standard)).]

Trial memoranda for the May 1, 2018 trial were due March 15, 2018.  [Dkt. 286.]  Neither party submitted a new trial memorandum.  On April 3, 2018, the court issued a notice presuming that the parties intended to rely on their prior trial memoranda.  [Dkt. 299.]  On April 5, 2018, the court accordingly ordered the Clerk's Office to re-issue the subpoenas for trial witnesses requested with Plaintiff's Second Trial Memorandum.  [Dkt. 301.]  Later that day, the court received Plaintiff's Third Trial Memorandum and eighteen applications for issuance of subpoenas for witnesses to testify at trial, including non-parties. [Dkts. 303, 306 – 310, 313 – 325.]

Lewis issued subpoenas for individuals who had no apparent knowledge of his case, including a member of the Governor's staff.  Plaintiff's trial memorandum did not contain sufficient information about the substance of the anticipated testimony to determine whether a subpoena should be issued or the date on which he anticipated the witness' testimony would be offered.  *Id.*  Each application sought to call the subpoenaed party to appear on May 1, 2018, the date of jury selection.  *Id.*  The dates set forth for the presentation of evidence were May 7, 9, 11, 14, 18, 21, 22, 24, 25, 31, and June 1.  [Dkt. 330.]  Accordingly, the court issued an Order granting the Plaintiff's motions for issuance of subpoenas, but ordered that witnesses would appear in the order listed in Plaintiff's Third Trial Memorandum beginning on May 7, 2018, with no more than five witnesses called on any particular day.  [Dkt. 341.]  The court entered a notice stating Plaintiff could object to the order in which witnesses were called to appear at jury selection on May 1, 2018.  *Id.*

Plaintiff also filed two pretrial motions with his Third Trial Memorandum: a motion to wear civilian clothes and not be restrained at trial [Dkt. 304] and a motion in limine to preclude evidence of his criminal history at trial.  [Dkt. 305.] The court granted the Plaintiff's unopposed motion to wear civilian clothes and denied his motion to be unrestrained in light of his demonstrated inability to control his anger, unpredictability, aggressive conduct toward opposing counsel and the court, and violent criminal history.  [Dkt. 345.]  The court denied Plaintiff's motion in limine, finding that Plaintiff's criminal history was relevant and potentially probative in light of Defendants' contention that their decision to

involuntarily medicate the Plaintiff was not deliberately indifferent to his medical needs.  *Id.*

On April 12, 2018, Plaintiff filed yet another motion for contempt which did not satisfy the contempt standard.  [Dkt. 331].  In it, he charged that a subpoenaed party failed in August 2016 to produce a video recording of surveillance footage from Northern Correctional Institution.  [Dkt. 331.]  The August 2016 subpoena directed the subpoenaed party to produce the recording of surveillance footage from June 9, 2011 to the Clerk's Office, so it could be used as a trial exhibit in the trial which was aborted because Plaintiff refused to enter the courtroom.  *Id.*  Plaintiff asserted he contacted the Clerk's Office on March 22, 2018, to confirm that the Clerk's Office had the recording, and the Clerk's Office responded that they had no record of receiving it.  *Id.*  Defendants responded that they had a copy of the recording, and asserted that it was provided to them at the abrupt close of the January 2017 trial along with Defendants' exhibits.  [Dkt. 336.] The court accordingly denied the motion for contempt and ordered Defendants to bring the recording to trial and deliver it to the courtroom deputy.  [Dkt. 337.] Defense counsel produced that recording on May 1, 2018.  [Dkt. 356 at 1:15:30 – 1:16:00.]

On April 16, 2018, Defendants moved for a status conference, asserting that many of the individuals listed as witnesses in Plaintiff's Third Trial Memorandum could not offer relevant testimony, that a number of Plaintiff's exhibits were irrelevant, and also alerting the court that defense counsel was unavailable on May 18, 2018 due to his son's college graduation.  [Dkt. 334.]  The

court denied the motion for status conference as the court was presiding over a trial which was not scheduled to end until the day before Plaintiff's trial and accordingly could not accommodate a conference; but the court offered to address the issues after jury selection, if time permitted.  [Dkt. 335.]

The court also vacated the May 18, 2018 trial date, as the remaining trial dates scheduled were sufficient to allow for the length of trial estimated by both parties, jury deliberations, and could also accommodate a modest measure of customary delay.  *Id.*

On May 1, 2018, the parties and 50 prospective jurors appeared for jury selection.  Mr. Lewis was uncooperative and disruptive of the proceedings once again.  A United States Marshal reported that when Mr. Lewis arrived at the courthouse he seemed "very agitated," did not want to be restrained in the courtroom despite the court's order, and told the U.S. Marshal not to talk to him.  [5/1/2018 email, Deputy United States Marshal A. Dave to Courtroom Deputy J. Shafer.]  The U.S. Marshal escorted Mr. Lewis out of the building and back into the Department of Corrections vehicle to calm down.  *Id.*  The U.S. Marshal read Mr. Lewis the court's order that he be restrained.  *Id.*  Mr. Lewis subsequently calmed down and was escorted back into the courthouse.  *Id.*

The court then took the bench to address preliminary matters with the parties before jury selection.  At this time, Plaintiff alerted the court that he was involved in a recent altercation with a corrections officer and was placed in restricted housing, where he did not have access to his legal materials and would not be able to complete his trial preparations.  He anticipated being in restrictive

housing through May 10. Accordingly, Plaintiff asserted he would not be able to proceed with trial through the first three days scheduled for presentation of evidence, and requested a modification of the trial schedule to begin on May 14, 2018 and proceed on three unscheduled days beyond those set aside for the presentation of evidence. The court had other matters scheduled after the trial dates set aside for this matter, including jury selection for multiple other cases and a bench trial, which precluded the court from extending the trial schedule as Plaintiff requested. The court explained that eliminating the first three days of trial would not leave enough dates for both parties to present their evidence and present closing arguments, for the court to instruct the jury, and for the jury to deliberate. Plaintiff then moved in the alternative for "extraordinary relief," namely for the court to order the Department of Corrections to allow him access to his legal materials while in restrictive housing, giving the impression that his possession of these items in the restrictive housing unit contravened the Department of Corrections' safety and security policies. The court explained that it had no authority to order the Department of Corrections to change the safety and security protocol of the restrictive housing unit.

The court asked Plaintiff to explain why he was in restrictive housing. Plaintiff described the events as follows:

> C: When were you placed in restrictive housing?
> P: On the 24th of April, which is a week ago, on the evening of last Tuesday. . . .
> C: Mr. Lewis, why are you in restrictive housing?
> P: According to prison staff at McDougal, they indicated that I interfered with safety and security. Specifically, they charged me with interfering with an officer's duties. They alleged that I interfered with the officer in securing the cell doors in the housing unit, and

specifically what she states in the report I delayed her from properly securing the unit by interrupting her, and the charge is interfering with safety and security. I don't have anything much to say about that because that's not been adjudicated and the facts are in dispute. I'm not going to get into the facts about it because it wouldn't be fair to them because they're not here. . . .

C: Mr. Lewis, I'm not concerned about the ultimate adjudication of – [interruption]

P: Yeah, I know you're not, your honor.

C: Listen to me. I'm not concerned about, I'm not responsible for, I will not weigh in in any way on the appropriateness of your being assigned to a restrictive housing unit from the standpoint of the Department of Corrections' disciplinary process. But I need to understand what you did that caused you to be placed in restrictive housing. Do you deny that you were present at the time they alleged you were present?

P: I don't deny that I was present. I deny the allegations in the disciplinary report.

C: Tell me from your perspective what happened.

P: I'll tell you what happened and before I tell you what happened it's important I give you some background on how the unit is operated. At McDougal, we're allowed to have access to typewriters for legal work only. Last Tuesday, I was preparing a motion for this case. I did the rough draft and I was attempting to go type it. . . . You have to first give the officer your ID to receive the [typewriter] ribbon. When it was time for us to be released at 6:30, I proceeded like I normally do . . . to the officer's desk to retrieve the ribbon. It's a room that we use to do the typing in. It's secure. So I waited for another officer who was on the floor to open that door to allow me in. In between that time, I think about 10 minutes had elapsed because there was new inmates moving into the unit and he was securing them on the bottom tier. You're technically not allowed to be out, but other inmates like me was on the top tier. . . . A tier is just a floor, it's the bottom, the lower level of the housing unit. . . . When I got into the room, I noticed that the correction tape, which is another device that's used in a manual typewriter, someone had removed it. Normally it's kept in there, but oftentimes some inmates take it out. The CTO, the Correctional Treatment Officer in the unit, she usually leaves an additional one . . . So when I realized that the correction tape wasn't there, I went back and asked the officer at the unit . . . the bubble . . . they call it a bubble, the officer station in each unit . . . I asked her, did the CTO happen to leave additional correction tape? She just went berserk – 'what am I your secretary?' . . . I was like 'No, I'm just trying to find out.' I said 'forget it,' and I give her . . . the ribbon back so I could get my ID, and then she wouldn't give it to me for whatever reason. She was telling me to lock up. . . . That means go inside your cell. At this time, I made a phone call and

I let my sister know that I'm probably going to seg. Because normally, whenever they say that, they're calling a lieutenant to bring you to seg.
C: Let's go back. You went to the bubble and asked if there was extra corrections tape. She started raising her voice at you . . . and then what happened?
P: I said let me have my ID . . . she was getting loud, I walked away from it. I went to use the phone.
C: And where was the phone?
P: If you're in the bubble, the phone is where the deputy is sitting . . .
C: Why did you call your sister?
P: Because she needed to know that I'm going to seg. and if I don't call her she'll know where I'm at.
C: Why did you think you were going to seg.?
P: Because this is a normal practice . . . Whenever they say 'lock up' they call in a lieutenant; that means you're going to seg. I just know that from my experience. . . . Actually, I called my sister twice. After I called her, I had some of my legal papers, my CD players, and my headphones inside of a bag. Being that I knew I was going to seg., I didn't want them to get lost. So I told my cellmate who was taking a shower at the time on the top level, I told him to make sure this got packed with my property when the C/O's came, I told him I was going to seg. Then I called my sister again and told her if she would bring my clothes on Tuesday and to make sure to remember to bring my reading glasses because I might not have them. At this time, just as I anticipated, several C/O's arrived and a lieutenant and handcuffed me and brought me to seg. And around 5:00 in the morning last Wednesday I was served with the ticket charging me with interfering with safety and security. In between that time I was interviewed by the unit manager of the unit I was in and I explained to her what happened, but the disciplinary hearing has not been held and I'm anticipating I will be found guilty and I will be held in a restrictive housing unit for 15 days, and that's estimating that I will be released around the 11th.
. . .
C: Mr. Lewis, what would have happened if you had gone to your cell as she told you to do?
L: Probably the same thing because once they call the lieutenant it doesn't matter, they're going to take you out of your cell anyway. . . . When she realized that I wasn't being bullied, I wasn't going inside my cell during my recreation period [she called the lieutenant].
C: *So she told you to go to your cell, you refused to go, and when she realized you refused to follow her instructions, she told you that you were going to seg. Isn't that consistent with disciplinary violation?*
P: *Yea, it's consistent with disobeying a direct order. It would have been a Class B offense under the code of discipline. . . . I don't dispute that I didn't follow her last order. What I dispute is the allegations and the substance of the complaint and the charge of her complaint that I*

*interfered with her duties . . . a Class A offense. . . You can get up to 10 days of punitive seg for a Class B offense. . . .*
**C: So Mr. Lewis, if you had gone to the bubble, and she had spoken to you aggressively, and told you to go to your cell, and you didn't go to your cell, *you knew at that time that was a Class B offense which could be punishable by housing you in segregation up to ten days where you would not have had your legal material and couldn't prepare for trial.***
**P:** *Yes.*

**[Dkt. 356 at 6:20 – 31:30] (emphasis added)**

Plaintiff then raised additional motions for the court to "refrain from offering the jury panel descriptions or definitions of medical conditions" in its statement of the case at the beginning of jury selection. *Id.* at 32:00. Plaintiff also moved for an order that courthouse personnel escort Plaintiff to the Clerk's Office and to the U.S. Marshal's Office at some point that day for official business. *Id.* at 34:00 – 35:35. Plaintiff refused the court's request that he explain why he needed to go to the Clerk's Office or the U.S. Marshal's Office, stating only that it was for "official business" and that *he* did not feel it was important to disclose his reasons. *Id.* Absent any reason to grant his motions, the court denied his requests to be escorted around the building to the clerk's office, where members of the public could be present, and the Marshals' office, where the lock-up is located.

The court confirmed that Plaintiff needed five days to put in his case and Defendants needed three days. Plaintiff confirmed that it would be "impossible" for him to proceed with trial as scheduled, with the presentation of evidence to begin on May 7. *Id.* at 1:11:00. The court then recessed, consulted its calendar, and found that, in light of the four cases scheduled for trial in June with jury

selection May 29, there was no possibility of trying this case unless the parties were prepared to proceed as scheduled. *Id.* at 1:13:00 – 1:14:55. The court again asked Plaintiff if he was prepared to proceed as scheduled, and he said he would not be prepared to present evidence on May 7, 9, or 11. *Id.* The court excused the venire panel and notified the parties that it would consider how to proceed. *Id.* at 1:15:00-1:15:20. That day, the court set a Rule 41(b) hearing for May 7, 2018 to consider whether to dismiss this action for failure to prosecute. [Dkt. 354.]

The court determined that under the Department of Corrections' administrative directives, disobeying a direct order is a class B offense punishable by up to 10 days in restricted housing. [Conn. Dept. of Corr. Admin. Directive 9.5 at 5, 12.]. Thereafter, the court issued an order stating:

> In view of the age of this case and the fact that the Plaintiff's conduct has twice prevented the case from proceeding to trial, once after a jury was selected and most recently after a venire panel had been summoned and without prior notice, which he had the opportunity to give, the court shall conduct a hearing to consider whether to dismiss this case for failure to prosecute on Monday, May 7, 2018 at 9:30am. The court orders Plaintiff's counselor to provide Plaintiff with a copy of the Notice of Electronic Filing as well as this accompanying Notice immediately.

## II. Standard of Law

"The authority of a federal trial court to dismiss a plaintiff's action with prejudice because of his failure to prosecute cannot seriously be doubted. The power to invoke this sanction is necessary in order to prevent undue delays in the disposition of pending cases and to avoid congestion in the calendars of the District Courts. The power is of ancient origin, having its roots in judgments of nonsuit and non prosequitur entered at common law." *Link v. Wabash R. Co.,*

370 U.S. 626 (1962) (affirming dismissal for failure to prosecute where plaintiff's counsel failed to appear at a duly scheduled pre-trial conference and gave no reasonable explanation for his absence, finding it could "reasonably be inferred from [counsel's] absence, as well as from the drawn-out history of the litigation that petitioner had been deliberately proceeding in dilatory fashion.").  The Supreme Court noted that the authority to dismiss for failure to prosecute was expressly recognized in Federal Rule of Civil Procedure 41(b), which states:

> If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it. Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule-- except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19--operates as an adjudication on the merits.

Courts conduct two analyses to determine whether dismissal for failure to prosecute is appropriate.  The first and most applicable here applies when a plaintiff refuses to go forward with a properly scheduled trial.  *Lewis v. Rawson*, 564 F.3d 569 (2d Cir. 2009).  The second "generally applies in cases involving instances of litigation misconduct such as the failure to comply with a scheduling order or timely to respond to pending motions."  *Id.* at 576 (citing *Drake v. Norden Systems, Inc.*, 375 F.3d 248 (2d Cir. 2004).  Both analyses are discussed below.

> a. <u>Analysis Where a Plaintiff Refused to Proceed with a Properly Scheduled Trial</u>

A district court acts well within its discretion in requiring strong justification for a continuance after a jury has been sworn.  *Lewis*, 564 F.3d at 577.  Where a plaintiff refuses to go forward with trial, "it is beyond dispute . . . that a district court may dismiss a case under Rule 41(b)" and may treat such

unwillingness "more severely" than "the more typical failure to comply with her discovery obligations on time, or to meet some other pre-trial deadline." *Lewis*, 564 F.3d at 580. There are no tests defining "strong justification" for a continuance or when dismissal is an appropriate "more severe" measure. However, courts point to certain circumstances as grounds for dismissal, including the insufficiency of other means of resolving a plaintiff's grievance, plaintiff's ability to proceed with available evidence and later request a continuance or to proceed with his or her full case and later appeal any adverse judgment, and plaintiff's history of delay or vexatious conduct. The categories of grounds for dismissal are discussed below.

### i. Dismissal Where the Court Considered Alternative Ways to Address the Issue, but Found them Insufficient

The Second Circuit has found insufficient justification for continuance where the plaintiff, an inmate, stated he feared for his life because he was being held at a facility where some of the defendants worked as guards. *Lewis*, 564 F.3d at 578. The Court emphasized the presumption that inmates will be treated properly and lawfully at any state correctional facility in rendering its decision. *Id*. The district court considered other options including detention in a special housing unit with 24-hour video surveillance and adjournment for a month to transfer the case to a different court so plaintiff could be housed in a different prison. *Id.* However, plaintiff refused to be placed in the special housing unit and the court found adjournment and transfer to a new venue untenable, as it would have required empaneling a new jury. *Id*. The court also considered the plaintiff and his counsel's delay in requesting a continuance, noting that even if plaintiff

and his counsel were not told explicitly that plaintiff would be transferred to a facility closer to the courthouse for trial, they should have known he would be transferred closer to the courthouse and that, given his crimes, he would be housed in a maximum security facility. At the least, he and his attorney stated they were aware of his impending transfer the weekend before trial was to begin. *Lewis* at 579. Their failure to raise the issue until the morning of trial was an unreasonable delay, and plaintiff's refusal to accept the solution provided by the court warranted dismissal. *Id.*

### ii. Dismissal Where Plaintiff Could have Proceeded with Available Evidence

It is insufficient to request a continuance at the beginning of a trial because key evidence is unavailable where the party could have proceeded with available evidence. In *Moffitt*, for example, the Seventh Circuit affirmed a district court's dismissal with prejudice where the plaintiff, who was hospitalized for drug and alcohol addiction, failed to appear for trial and her attorney announced she was not prepared to go forward in her client's absence. *Moffitt v. Illinois State Bd. of Ed.*, 236 F.3d 868, 868-69 (7th Cir. 2001). Plaintiff's counsel explained plaintiff was the only one who could testify to matters alleged in the complaint, but the Court found ten depositions had been taken in the case and the attorney could have proceeded by calling other witnesses and introducing plaintiff's deposition, interrogatories, and other exhibits. *Id.* Further, plaintiff had "by her misfeasance and nonfeasance . . . shown no interest in moving forward with the trial" because she did not read the notice from her attorney regarding the trial date, did not notify her counsel she was voluntarily checking into a drug treatment program,

and failed to submit credible evidence that she was physically unable to attend trial." *Id.* "Once [plaintiff's] pretrial motions for a continuance had been denied and the jury was empaneled, [plaintiff] and her counsel should have expected that the case would be dismissed if they did not proceed with the trial." *Id.* On review, the Seventh Circuit noted there was no real record of delay on plaintiff's part and sanctions less severe than dismissal had not already proven ineffective, but those considerations were outweighed when the plaintiff was unwilling to proceed on the trial date scheduled. *Id.* at 873. The Seventh Circuit considered evidence that plaintiff's drug addiction had spiraled out of control and she reasonably decided to begin rehabilitative treatment, but also noted that plaintiff should have provided the court with evidence of her treatment during the week before trial when she was admitted to establish her unavailability. Finally, the Seventh Circuit found that plaintiff's counsel could have proceeded with other evidence rather than refusing to proceed at all. The Court concluded the district court acted reasonably in denying a continuance and dismissing the case. *Id.* at 876.

The Fifth Circuit has also dismissed when plaintiff's counsel could have begun the trial with the evidence available. In *Lopez v. Aransas Cnty. Independent Sch. Dist.*, 570 F.2d 541 (5th Cir. 1978), plaintiff alleged race-based employment discrimination. On May 5, 1977 the court clerk set the case for docket call on June 13. On the day of trial, plaintiff's counsel stated the plaintiff was unavailable for trial and would remain unavailable until the following month when the academic year ended. *Id.* at 544. The court denied the motion for a

continuance.  Plaintiff's attorney refused to call any witnesses, although plaintiff's deposition had been filed and ten defense witnesses including named defendants were present.  *Id.*  The court dismissed with prejudice and also noted that plaintiffs knew months earlier when the case was scheduled and when plaintiff was available, but made an eleventh-hour oral motion for a continuance. *Id.*

Similarly, in *Michelsen v. Moore-McCormack Lines, Inc.*, 429 F.2d 394 (2d Cir. 1970), plaintiff alleged injury due to poor conditions on his employer's boat. The week of trial, plaintiff's counsel requested a postponement due to unavailability of plaintiff, who was at sea, and his doctor, who was ill.  The Court suggested the case proceed as to liability, but counsel stated plaintiff's prima facie case required the unavailable doctor.  The Court then suggested testimony via telephone, but counsel stated the doctor was too ill to participate at all.  The Court postponed the case until the following Monday, at which point plaintiff's counsel renewed his motion to adjourn.  The jury was sworn and the Court denied plaintiff's motion, stating counsel should proceed with plaintiff's deposition transcript.  When plaintiff refused to proceed, the Court dismissed for failure to prosecute.  *Id.* at 395.  Even though plaintiff's counsel could not have foreseen his doctor falling ill, the Second Circuit affirmed, stating Plaintiff's counsel "presumably had other evidence" including plaintiff's deposition transcript and should have presented the evidence available and then requested an adjournment until Monday to permit the doctor and plaintiff to testify.  *Id.* at 396.  If counsel had done so, the Court could have assessed the importance of

the doctor's testimony to liability in considering whether to grant an adjournment. But with no evidence presented, the Court did not abuse its discretion in denying an adjournment and dismissing the case.

### iii. Dismissal Where Plaintiff Could have Proceeded with Trial and Later Appealed any Adverse Judgment

Similar to situations where the plaintiff could have presented available evidence and later requested a continuance, dismissal is also appropriate where a plaintiff could have presented his case in full and preserved his objections for appeal. In *Eddy v. Weber County*, 77 F.3d 492 (10th Cir. 1996), after the jury was impaneled and opening statements were made, the pro se plaintiff requested all witnesses be sequestered. The Court granted the motion except as to the sheriff, who was sitting at defense counsel table, because he was the designated representative for the defendant. The plaintiff objected, arguing other members of the sheriff's department would not testify truthfully in the sheriff's presence. The Court warned if plaintiff was unwilling to proceed, "I'll just dismiss the case. Is that what you want?" *Id.* at *1. The plaintiff stated he would not proceed, and the Court dismissed the case for failure to prosecute. The Tenth Circuit upheld the decision, stating plaintiff could have proceeded at trial and raised his challenge to the court's ruling on appeal from any adverse judgment, but plaintiff's refusal to proceed even with the Court's threat of dismissal warranted dismissal. *Id.*

Likewise, a court has "no real choice but to dismiss the case" when the plaintiff attempts to forego trial in favor of an immediate appeal of an adverse ruling. In *Palmieri v. Defaria*, 88 F.3d 136 (2d Cir. 1996), plaintiff alleged copyright

infringement.  The parties appeared for the first day of trial, but plaintiff's counsel requested a stay so he could take an interlocutory appeal of an adverse *in limine* ruling.  The Court denied the request.  Plaintiff's counsel asserted the plaintiff had insufficient evidence for trial and would permit judgment to be entered against him so he might appeal the final judgment.  The court instead dismissed the case for failure to proceed with trial.  *Id.* at 138-9.  The Second Circuit affirmed, noting the plaintiff could have proceeded with his case especially since the district court expressed willingness to revisit his evidentiary rulings depending on how the evidence developed at trial.  *Id.* at 141.

### iv. Dismissal Where Plaintiff has a History of Protracting Litigation or Vexatious Conduct

A plaintiff's history of protracting litigation and requesting trial continuances may also serve as grounds to deny a continuance and dismiss for failure to prosecute, regardless of the basis for the final request.  In *Doe v. Winchester Bd. of Ed.*, 2017 WL 214176 (D. Conn. Jan. 18, 2017) (Bolden, J.), plaintiff alleged defendant school board failed to protect her minor child from alleged sexual assault by a classmate.  The Court denied summary judgment on March 21, 2013, after which the case was scheduled for trial and postponed five times, each time at Plaintiff's request, often on the "very eve of trial."  *Id.* at *1. Prior trial dates were postponed because plaintiff failed to submit exhibits, moved to add new witnesses to her witness list as late as three days before trial, agreed to an (ultimately unsuccessful) settlement conference three days before a previous trial date, and counsel moved to withdraw on the eve of two different trial dates.  *Id.*  After the fifth motion for a continuance, the Court issued an Order

to Show Cause why the case should not be dismissed for failure to prosecute. *Id.* The Order warned that plaintiff's failure to respond to the Order to Show Cause could, by itself, result in dismissal for failure to prosecute. *Id.* Plaintiff failed to file a response memorandum and failed to appear in person at the show cause hearing, appearing by telephone instead. "Based on the protracted history of this case and the Court's numerous interactions with Plaintiff, including an on the record colloquy and an in camera discussion with her and her current counsel, the Court has no reason to believe that Plaintiff will ever be able to proceed to trial. Plaintiff has proven incapable of maintaining counsel and complying with Court orders essential to this case proceeding to trial, such as by failing to appear for Court-ordered proceedings." *Id.* at *1. The Court found Plaintiff's refusal to proceed with five scheduled trial dates, three in the span of a three-month period preceding the Court's Order to Show Cause, justified dismissal under Rule 41(b). *Id.* at *12.

Similarly, in *Zagano v. Fordham Univ.*, 900 F.2d 12 (2d Cir. 1990), the plaintiff filed an employment discrimination action. The case proceeded through discovery for four years, during which time two witnesses died and two others fell into poor health. *Id.* at 13. At a pretrial conference, plaintiff's counsel stated plaintiff intended to pursue the action and trial was set. Plaintiff's counsel protested that discovery was not complete, and the court briefly extended the discovery deadline, but plaintiff made no further efforts to complete discovery. *Id.* On the discovery deadline, plaintiff requested that the case be placed on the suspended case calendar. The Court denied the request but continued the trial

by nine days.  Nine days before trial, plaintiff's counsel moved to voluntarily dismiss the case because plaintiff brought the action "inadvertently," and preferred to resolve the dispute through an administrative hearing.  The Court denied the motion for undue delay.  When plaintiff declined to proceed with trial, the Court dismissed with prejudice under Rule 41(b), citing plaintiff's use of the federal action as an instrument of vexation and the fact that defendants had been prejudiced by the time spent preparing for trial and diminishing availability of witnesses.

Similarly, even where no single act is particularly egregious, dismissal may be appropriate based on the cumulative effect of a party's multiple delays.  In *Theilmann v. Rutland Hosp., Inc.*, 455 F.2d 853 (2d Cir. 1972), plaintiff alleged medical malpractice.  Plaintiff retained new counsel within months of trial, who upon his appearance informally requested that the case be postponed and left the country for a vacation without awaiting a response from the court.  Another lawyer from new counsel's firm wrote a second letter requesting postponement until September given his partner's vacation, and the motion was denied.  On the first day of trial, one of the new lawyers appeared, argued plaintiff's case was not prepared to proceed and requested a continuance.  The court declined.  Counsel then stated he could not proceed, and the court dismissed with prejudice under Rule 41(b).  The Second Circuit upheld the ruling stating the cumulative acts of plaintiff's new counsel caused unnecessary delay, even though the retention of new counsel might under other circumstances have warranted a continuance.

The Second Circuit has also dismissed where plaintiff failed to timely notify the court of the need for a delay, even where the need may have been legitimate. In *Ali v. A&G Co.*, 542 F.2d 595, (2d Cir. 1976), plaintiff brought a personal injury suit. The day before trial, plaintiff's counsel requested a trial delay to complete discovery. The court denied the request. On the first day of trial, plaintiff and his counsel failed to appear. The Court dismissed with prejudice for lack of prosecution and later denied a motion to vacate that dismissal. The Second Circuit affirmed, citing plaintiff's failure to explain the discovery delay until the eve of trial, and failure to arrange their schedules to be present. *Id.* at 596.

   b. <u>Analysis for Other Litigation Misconduct</u>

Dismissal is a harsh remedy and is appropriate only in extreme situations." *Lucas v. Miles*, 84 F.3d 532, 535 (2d Cir. 1996). A case should not be dismissed unless "particular procedural prerequisites" are accorded to the Plaintiff, including "notice of the sanctionable conduct, the standard by which it will be assessed, and an opportunity to be heard." *Mitchell v. Lyons Prof'l Servs., Inc.*, 708 F.3d 463, 467 (2d Cir. 2013) (collecting cases). Federal Rule of Civil Procedure 41(b) authorizes the district court to dismiss an action "[i]f the plaintiff fails to prosecute or to comply with [the] rules or a court order."

"[*P*]*ro se* plaintiffs should be granted special leniency regarding procedural matters," and their claims should be dismissed for failure to prosecute "only when the circumstances are sufficiently extreme." *LeSane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2001) (internal quotation marks omitted). Courts

should be especially hesitant to dismiss claims for procedural deficiencies. *Lucas*, 84 F.3d at 535.

The Second Circuit has made clear that the analysis for dismissal under Rule 41(b) for failure to proceed with a duly scheduled trial (discussed above) is distinct from the analysis for dismissal due to "litigation misconduct such as the failure to comply with a scheduling order." *Lewis*, 564 F.3d at 576, *Baptiste v. Sommers*, 768 F.3d 212, 216 (2d Cir. 2014) (per curiam). However, courts often discuss both tests when determining whether dismissal for failure to proceed with trial is appropriate. The five *Drake* factors for dismissal for litigation misconduct are whether:

I. the plaintiff's failure to prosecute caused a delay of significant duration;
II. plaintiff was given notice that further delay would result in dismissal;
III. defendant was likely to be prejudiced by further delay;
IV. the need to alleviate court calendar congestion was carefully balanced against plaintiff's right to an opportunity for a day in court; and
V. the trial court adequately assessed the efficacy of lesser sanctions.

*Drake v. Norden Sys., Inc.*, 375 F.3d 248, 254 (2d Cir. 2004). None of these factors is dispositive. *Baptiste v. Sommers*, 768 F.3d 216. All factors need not weigh in favor of dismissal for dismissal to be appropriate under *Drake*. *See, e.g.*, *Lewis*, 564 F.3d at 583 (finding that three factors supported dismissal and two were neutral and affirming the district court's dismissal with prejudice). How courts evaluate each factor is discussed below.

I. **Step One**

While the *Drake* factors are by their nature a case-specific analysis, courts have found a delay of trial by as little as ten days to be "significant" where it was preceded by repeated delays throughout the litigation. *See, e.g., Peart v. City of N.Y.*, 992 F.2d 458, 462 (2d Cir. 1993) (discussed below). In addition, where both parties have played a role in the slow pace of litigation, dismissal may still be appropriate where the delays were largely caused by plaintiff. *See, e.g., Drake*, 375 F.3d 248 (discussed below).

In *Drake*, plaintiff alleged that defendant contractors had defrauded the government under the False Claims Act. The case was stalled for three years until the government decided not to intervene, and then the complaint was served on defendants and amended twice, the last of which on December 17, 1997. 375 F.3d at 252. Defendants moved to dismiss and on August 24, 2000 the Court dismissed certain counts without prejudice to amending the complaint within 60 days. Plaintiff failed to amend within the time allotted and on July 25, 2001 the court granted partial summary judgment. On January 31, 2002, the court notified plaintiff there had been no action on his case in six months and the case was subject to dismissal unless plaintiff gave a satisfactory explanation for its inaction within 20 days. *Id*. at 254. Plaintiff's counsel responded within the 20 day window with a third amended complaint and explanation that the case was complex, required significant discovery and motions practice, and counsel had experienced scheduling conflicts. The court found significant the 17 month delay between the court's order to amend the complaint and the plaintiff's submission of an amendment, filed only after the court issued a warning of dismissal. *Id.* at

**255.**  The court found that although the slow pace of the litigation was not exclusively caused by plaintiff, it was caused largely by plaintiff and weighed in favor of dismissal.  *Id.* at 255.

The *Lewis* court also considered the *Drake* factors in addition to the "substantial justification" factors discussed earlier in this memorandum.  The court found the plaintiff's request to transfer the case to a different courthouse in order to house the plaintiff at a different prison would have required a delay of two to three weeks.  564 F.3d at 582.  The proposed transfer "not only risked a mistrial, it demanded it."  *Id.* at 582.  The delay was significant and weighed in favor of dismissal.  *Id.*

Even where the requested trial delay is only ten days, the delay may be significant, because to excuse such a request would ignore the fact that when delays are "multiplied over and over for one reason or another in one case after another, as [they] surely [are] and would be once the bar realizes that deadlines mean nothing, the net result is the build-up of a paralyzing backlog of pending cases."  ***Peart v. City of N.Y.***, 992 F.2d 458, 462 (2d Cir. 1993) (cited by *Drake* as fashioning the factors now known as the *Drake* factors).  In *Peart*, the Court found delay throughout the litigation significant where discovery continued for three years and involved extensions sought by both parties.  Once discovery closed, plaintiff refused to collaborate on the joint trial memorandum, but instead submitted his own trial memorandum deleting eight of defendant's witnesses and adding a new claim.  *Id.* at 460.  After holding a hearing, adding defendant's missing witnesses and deleting the additional claim, the Court allowed each party

to file his own pre-trial memorandum and scheduled the case for trial.  Three weeks before trial, plaintiff's counsel stated she was unavailable due to a conflicting trial date.  *Id*. at 460.  At a pretrial conference four days before trial, plaintiff's counsel stated she had no intention to file pretrial materials because she was on trial in another matter.  The Court refused to postpone the trial date until after the conflicting trial ended.  *Id*. at 461.  When plaintiff's counsel failed to appear on the day of trial, the Court dismissed for failure to prosecute and noncompliance with the Court's order to proceed.  The Second Circuit found the delay sufficient under the first *Drake* factor due to plaintiff's particularly egregious behavior, and due to the combined effect such behavior has on the court calendar.

Conversely, where a pro se plaintiff causes a one month delay in responding to summary judgment briefing, such delay does not weigh in favor of dismissal.  In *LeSane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206 (2d Cir. 2001), plaintiff sued his former employer for race and religious discrimination.  Plaintiff's attorney withdrew during discovery and plaintiff proceeded pro se.  Eighteen months later, the court ordered plaintiff to file a status report and warned if he failed to do so the court would dismiss for failure to prosecute.  *Id*. at 209.  Both parties submitted status reports and defendant moved for summary judgment.  When plaintiff did not file an objection, the court ordered plaintiff to respond to the defendant's Rule 56.1 statement of facts within ten business days or risk dismissal under Rule 41(b).  Plaintiff did not respond and two months later the court dismissed with prejudice.  The Court found the case as a whole had not

been efficiently litigated, but the noncompliance causing dismissal was only a month old.  Since plaintiff was pro se, that tardiness did not weigh in favor of dismissal with prejudice.  *Id.* at 210.

The length of delay occasioned by Plaintiff's voluntary and knowing conduct is considerable.  This case was filed on July 20, 2012.  After numerous extensions of the court's scheduling orders, the court herded the Plaintiff to trial, conducted jury selection and was scheduled to commence the presentation of evidence on January 5, 2017.  On that date, Mr. Lewis belligerently refused to proceed with the presentation of evidence, falsely stating corrections officials denied him access to his legal material, reading glasses and bathing facilities.  The court conducted two days of hearings at which evidence was introduced to establish that Mr. Lewis was not denied his legal material, glasses and bathing facilities.  He simply refused to access them because prison officials would not give him his material immediately, but rather searched them first consistent with safety and security protocol.  Despite his voluntary refusal to proceed with trial, the court reopened the case to afford Plaintiff an opportunity to resolve the case on the merits.  Jury selection was again scheduled for May 1, 2018, just days after the court concluded a criminal trial and weeks before the court's May 29, 2018 jury selection date, when no fewer than three trials were scheduled to proceed and a bench trial was also scheduled to convene.  There was simply insufficient time to complete the trial unless it proceeded as scheduled.  The court's next conceivable available date was October 2, 2018, on which there are presently nine

cases scheduled for trial.  The delay occasioned by Plaintiff's conduct is considerable.

II.    <u>Step Two</u>

Step two of the *Drake* factors considers whether the court gave notice that further delay would cause dismissal.  The Second Circuit has found it persuasive when a court has made clear statements to the plaintiff or his counsel advising that continued failure to proceed with trial would result in dismissal.  *See, e.g.*, *Lewis*, 564 F.3d 569.  However, warnings to pro se plaintiffs using technical language may not be sufficient.  *LeSane*, 239 F.3d 206.

For example, the *Drake* court found the only notice of risk of dismissal plaintiff received was the court clerk's warning that the case would be dismissed absent a satisfactory explanation for his inaction within 20 days.  375 F.3d at 254. Plaintiff timely submitted an explanation, but with it also requested an extension to complete complex research and discovery.  *Id*.  The district court dismissed the case, but gave no notice that Drake's case would be dismissed if there was any further request to delay the litigation.  *Id.*  The Second Circuit found the district court gave insufficient notice of the risk of dismissal.

Conversely, the Second Court found the district court in *Lewis* gave "clear notice" to both plaintiff and his lawyer that plaintiff's refusal to go forward with trial would result in dismissal. 564 F.3d 569.  When plaintiff notified the court of his fear of retaliation from defendant guards working at the prison where he was being held, the *Lewis* court discussed an alternative arrangement with plaintiff, whereby he could be housed in a special unit at the prison under 24-hour

surveillance.  When plaintiff refused that arrangement, the court stated "If there's no other solution, I would dismiss the case and certainly preserve his right to appeal."  *Id*. at 574.  The court gave multiple opportunities for plaintiff to confer with his counsel to decide whether to change course to avoid dismissal.  *Id*.  This was sufficient notice of the risk of dismissal under the second *Drake* factor.

Similarly, the *Peart* Court found notice of the risk of dismissal was given at the pretrial conference when the Court specifically told counsel that if she did not appear on day one of trial she must inform her client that the case will be dismissed.  992 F.2d at 462.

However, in *LeSane*, the Court found the district court's notice to the pro se plaintiff that "if it received no submission from plaintiff by August 3, 1999, the Court would dismiss this case pursuant to Rule 41(b) of the FRCP for failure to prosecute" was a "brief and technical" warning.  239 F.3d at 210.  The Second Circuit found the district court should have fully described what was needed using ordinary language and commonplace examples.  The notice given leaned in favor of dismissal but did not require it.

Mr. Lewis knew the consequence of his refusal to proceed with trial as scheduled.  As an initial matter, this case has been dismissed previously twice due to Mr. Lewis' failure to prosecute.  [Dkts. 25, 224.]  In fact, the case was dismissed in January of 2017 for his failure to proceed with trial after the jury was selected and was waiting in the jury deliberation room to be brought into the courtroom to hear the first day of evidence.  In that instance, the court reopened

the case after two days of hearings in a written decision explaining the law in this area.

On the day of the first day of jury selection for the second trial, May 1, 2018, Mr. Lewis stated he was unprepared to proceed while the jury panel was in the jury assembly room waiting to be brought into the courtroom for jury selection.

That day, the court scheduled a Federal Rule of Civil Procedure 41(B) Hearing for May 7, 2018, formally notifying the Plaintiff that the case could be dismissed. Mr. Lewis obfuscated the court's attempt to give him a final opportunity to avert dismissal at the May 7, 2018 hearing. Mr. Lewis refused to participate meaningfully in the hearing; when offered the opportunity to cross-examine the defense witnesses, he refused to state whether he wished to do so. Instead, he continuously repeated a mantra to the effect that Rule 41 afforded him an opportunity to be heard and that he did not have to offer evidence. Despite refusing to offer evidence, Mr. Lewis repeatedly interrupted the defense's presentation of evidence, contradicting the witnesses and offering factual content. When reminded that he would have to be sworn in if he wished to offer evidence, Mr. Lewis repeated his mantra in apparent refusal to take the oath and continued to interject. After several rounds the court ignored Mr. Lewis and heard the Defendants evidence.

The evidence offered by the Defendants established that a person in the restrictive housing unit    is entitled to have their property, including legal material in their cell. It further established that Mr. Lewis did not have his property because he never requested it.

Mr. Lewis had clear notice that the case would be dismissed if he did not proceed with trial as scheduled or show cause why he could not have done so. Mr. Lewis refused to participate in the Rule 41(b) hearing leaving the court no choice but to dismiss the case again for voluntarily refusal to proceed with trial with the knowledge that he case would be dismissed.

## III.    Step Three

Step three of the *Drake* analysis requires courts to consider whether the defendant is likely to be prejudiced by further delay.  Where the delay in question is lengthy, prejudice may be presumed as a matter of law.  *Drake*, 375 F.3d at 257. The need to spend time and money preparing for trial weighs in favor of dismissal, although it does not by itself require dismissal.  *See Lewis*, 564 F.3d at 582; *Peart*, 992 F.2d at 462.

At step three, the *Drake* court noted prejudice may be presumed as a matter of law depending on the length of and justification for the delay.  375 F.3d at 257.  However, even where prejudice is presumed, it is rebuttable and both sides should submit evidence to support their arguments.  *Id.*  Showcasing the refutability of this presumption, the Second Circuit found delay in filing a third amended complaint caused only limited prejudice to defendants regarding claims from the prior complaint which survived summary judgment, as the defense was "in a good position to preserve evidence and prepare their defense" without the third amended complaint.  *Id.* at 257.  By comparison, defendants suffered greater prejudice as to claims from the prior complaint which had been dismissed without prejudice, because defendants were left "in the dark as to the exact

contours of the charges against them" for the full 17 months during which plaintiffs delayed before filing their third amended complaint. *Id.* at 257.

The *Lewis* court found delay of two to three weeks would prejudice "the entity bearing the defense's costs . . . insofar as it had expended resources to arrange for the presence of the eight defendants, an additional witness, and plaintiff himself on the day of trial." 564 F.3d at 582. That prejudice would not by itself warrant dismissal, but did weigh in its favor. *Id.*

The *Peart* court, like the *Lewis* court, also noted the presumption of prejudice resulting from unreasonable delay and the time and money defendants spent preparing for a trial to begin as scheduled. *Id.* at 462. The need to expend such resources again for a new trial date would prejudice the defense. *Id.*

However, illustrating that the presumption of prejudice is rebuttable, the *LeSane* Court found no evidence that plaintiff's delay caused any particular or especially burdensome prejudice to defendants beyond the delay itself. 239 F.3d at 210. For example, there were no indications that the delay increased the litigation costs for defendants or reduced their likelihood of success on the merits. Even so, the *LeSane* court found the third *Drake* factor leaned slightly in favor of dismissal. *Id.*

The Defendants would be prejudiced by any further delay. First, this case has been protracted unnecessarily by the Plaintiff. He has been unnecessarily litigious, combative, and uncooperative. It was filed more than six years ago, trial has been scheduled and rescheduled multiple times, a jury was selected, and counsel appeared to select a second jury. The Defendants, physicians charged

with providing medical care to inmates, have been repeatedly drawn away from their important duties to attend and testify at court proceedings. State officials with seemingly little or no information about the case have been summoned to testify. Memories are doubtlessly fading, and one defendant no longer works for the Department of Corrections. The unnecessary time and cost to a state with a burgeoning deficit is highly prejudicial and the medical care of inmates is being compromised by this protracted litigation.

IV. <u>Step Four</u>

Step four of the *Drake* analysis considers the need to alleviate court calendar congestion carefully balanced against the plaintiff's right to an opportunity for a day in court. Where a plaintiff "swamp[s] the court with irrelevant or obstructionist filings," this factor is more likely to weigh in favor of dismissal than where a plaintiff has silently failed to proceed in a timely fashion. *LeSane*, 239 F.3d at 210.

At step four, the *Drake* court noted that plaintiff's delay had not impacted the trial calendar or otherwise impeded the court's work. 375 F.3d at 257. This factor weighed against dismissal. *Id.*

The district court in *Lewis* did not express on the record whether it balanced the court calendar with plaintiff's right to a day in court. 564 F.3d at 582. Absent evidence of such balancing, the Second Circuit found the fourth *Drake* factor neutral.

The *Peart* court did carefully balance the court's calendar with plaintiff's rights and found the fourth *Drake* factor weighed in favor of dismissal. 992 F.2d

at 462.  The presiding judge was sitting by distinction for a limited time to relieve court backlog, and delay would have caused the case to be put back on the original judge's docket in contravention of the purpose behind having a guest judge serve by distinction.  *Id.*  The court also noted that "the failure to be ready for trial is one of the basic causes creating a backlog of calendars," and found plaintiff's counsel's failure to appear for trial, failure to timely file pre-trial materials, and disrespect for the Court warranted dismissal despite the consequences to the client.

Finally, the *LeSane* Court found no "compelling evidence of an extreme effect on court congestion," and noted that "plaintiff's failure to prosecute in this case was silent and unobtrusive rather than vexatious and burdensome: plaintiff simply did not make submissions required by the court; he did not swamp the court with irrelevant or obstructionist filings."  239 F.3d at 210.  This factor did not weigh in favor of dismissal.

This case was already delayed nearly a year and one half because of Mr. Lewis' prior  refusal to proceed with trial and the court's full trial and hearing docket.  In light of Mr. Lewis' most recent refusal to go forward, if the court were to reschedule this trial yet again it would be delayed until October 2018 at the earliest.  Mr. Lewis has had an opportunity to have, but chose not to have, his day in court.  The uncontested evidence at the Rule 41 hearing established that inmates, including Mr. Lewis, may have legal papers and reading glasses in the restricted housing unit upon request.  Mr. Lewis does not contend that he did have his materials and glasses, and the facts reflect that he did not request these

items.  Mr. Lewis routinely demonstrates to the court his keen knowledge of Department of Corrections Administrative Directives, and the defense offered evidence at the Rule 41 hearing that this was not Mr. Lewis' first experience in the restrictive housing unit.  Mr. Lewis knowingly and voluntarily caused himself to be transferred to the restrictive housing unit, made arrangements to have his sister bring clothing for him to wear in court, and arranged to have his cellmate secure certain of his personal belongings.  He did not so much as request his legal material so that he would be prepared for his court appearance.  Balancing the impact of Mr. Lewis' dilatory and obstreperous conduct on the court's calendar against his right to have the court summon a third jury panel to select a jury to hear his case weighs in favor of dismissal.

V.  **Step Five**

Finally, the fifth *Drake* factor is whether the trial court adequately assessed the efficacy of lesser sanctions before dismissing.  A brief statement that lesser sanctions, such as a fine, would be inadequate may be sufficient.  *See Peart*, 992 F.2d at 463.

The district court in *Drake* briefly considered imposing a fine as a lesser sanction for plaintiff's failure to file a third amended complaint until 17 months after the deadline.  375 F.3d at 255.  The district court rejected a fine as inadequate to address the prejudice to defendants, and the Second Circuit found that conclusion was not "clearly erroneous."  *Id.*  However, the Second Circuit noted the district court should have explained on the record why a sanction less severe than dismissal would have been insufficient.  *Id.*

The district court in *Lewis* did not consider the efficacy of lesser sanctions on the record.  564 F.3d at 582.  The Second Circuit noted the omission and found the fifth *Drake* factor neutral, weighing neither for nor against dismissal.  *Id.*

In *Peart* that "no lesser sanction, other than the award of fees and costs to the defendant, is appropriate or would be sufficiently potent given [attorney's] behavior and actions" was sufficient to show the court did consider lesser sanctions but concluded they were not justified given plaintiff's counsel's egregious behavior.  992 F.2d at 463.

The court in *LeSane* found no indication the district court considered lesser sanctions, such as deeming defendant's Rule 56.1 statement of facts admitted absent objection.  239 F.3d at 211.  Given the clear alternative to dismissal in *LeSane*, the Second Circuit found the district court's failure to consider it on the record weighed against dismissal.  *Id.*

Mr. Lewis is indigent.  He has filed a plethora of cases in this court, in all of which he qualified for a filing fee dispensation.  Imposition of a fine would have no effect on him.  Nor would any other sanction be effective, as Mr. Lewis is incarcerated.  Moreover, Mr. Lewis knowingly and voluntarily caused his transfer to the restrictive housing unit.  He failed to follow the corrections officer's instruction to return to his cell, knowing that trial was imminent and that the punishment would be segregation.

Finally, for the second time, Mr. Lewis refused to prepare for trial, and for that reason for the second time refused to proceed with trial.  He was deceitful on both occasions, falsely claiming that he was deprived of his trial material.  Mr.

Lewis had no truly legitimate reason for failing to go forward with trial on either occasion.  His repeated willful misconduct constitutes an intolerable abuse of the judicial process for which no sanction but dismissal would be effective.

### VI.    Conclusion: Plaintiff's Case Warrants Dismissal

In summary, The *Drake* factors weigh in favor of dismissal in *Lewis v. Frayne*:  (1) Mr. Lewis caused a delay of an indeterminate duration by failing to proceed with trial as scheduled. (2) The court gave immediate notice of a Rule 41(b) Hearing Mr. Lewis appeared but refused to meaningfully participate. (3) The defense is prejudiced as it now must spend additional time and resources preparing for trial a fourth time as memories fade and the medical needs of Defendants are repeatedly delayed on dates they are repeatedly summoned to appear in court for hearings and trials. (4) The trial is delayed for an extended period because court has multiple trials scheduled for May 29, 2018 jury selection, has already set dates for one June 2018 trial (*Majocha v. Eversource Energy Service*, 3:16-cv-742), and has already set dates for a July 2018 trial (*United States v. Cirino*, 17-cr-232), and Mr. Lewis has a pattern of voluminous frivolous motion and hearing practice leading up to any court appearance. (5) The court considered, but found that it had no legal authority to grant, Plaintiff's motion for "extraordinary relief" to order corrections to waive any safety and security protocol which prevented him from having his legal material in the restricted housing unit.  Finally, the court has repeatedly employed lesser means to avoid dismissal of Plaintiff's case for failure to prosecute, all to no avail, including most recently holding a hearing on the record after Plaintiff's failure to

enter the courtroom on the first day of evidence at his January 2017 trial and the rule 41lb) hearing after he informed the court on May 1, 2018 that he refused to proceed with trial. Such accommodations have proven unavailing and perhaps emboldening.

There is "strong justification" for dismissal under Rule 41(b) and *Lewis v. Rawson*. Although Mr. Lewis professes that he will not have his legal materials through May 10, 2018 and cannot put the "finishing touches" on his trial preparations, the evidence shows that this is not true. Moreover, Mr. Lewis admitted he made the same false claim as an excuse for his refusal to go forward with evidence in the last trial scheduled in this case after which the case was dismissed for failure to prosecute. Mr. Lewis knew the consequence of yet another willful refusal to proceed.

Even assuming he was deprived of his material, he could have proceeded to trial and done his best, and appealed any adverse verdict, particularly since this case has been pending since 2012 and Plaintiff has submitted trial memoranda for three scheduled trials in this case, in July 2016, January 2017, and May 2018. That he bears the weight of his transfer to restricted housing is apt since he was transferred because he willfully refused to go to his cell when instructed. Instead he walked around the unit making multiple telephone calls and talking to his cellmate flagrantly flouting a direct order of a corrections officer knowing that he was engaging in an offence punishable by a transfer to segregation.

Plaintiff's history of uncivil behavior, courtroom disruptions, aggressive courtroom behavior, frivolous filings, including motions for sanctions of opposing counsel, recusal of the court, requests to subpoena state officials with no relevant information, for reconsideration which fail to satisfy the oft-articulated standard, refusal to participate in proceedings as well as his repeated failure to proceed on the eve of trial, is the type of extreme vexatious conduct which overburdens the court, prejudices defense and makes a mockery of the justice system.  This conduct strongly weighs in favor of dismissal particularly where, as here, the court has made every gesture and concession to the Plaintiff in deference to the fact that he terminated his court-appointed *pro bono* counsel (as he did in *Lewis v. Waterbury* 3:10-cv-00112-VLB on the eve of trial. Dkt. 164) and insisted on proceeding *pro se*.  Mr. Lewis has forfeited his right to prosecute this case.  For all of the reasons set forth above, this case is DISMISSED with prejudice.

### VI. Plaintiff is Awarded Nominal Damages

Plaintiff is entitled to nominal damages for the deprivation of his procedural due process rights.  In July 2016, the Court granted summary judgment in Plaintiff's favor as to his procedural due process claim.  [Dkt. 139 at 15-16 ("Defendant Frayne's involvement in Lewis's treatment prior to and continuing after the hearing, his supervisory role at Northern, his appointment as Lewis's advocate at the hearing, the absence of any indication that Frayne actually advocated against the forcible administration of medication against Lewis's will, and his membership on the three-person health panel charged with

deciding whether to authorize Lewis's involuntary medication, collectively, render unconstitutional the procedures under which the panel reached its decision and Lewis was forcibly medicated against his will.").] Plaintiff is accordingly entitled to damages for his Constitutional deprivation. *Carey v. Piphus*, 435 U.S. 247, 266-67 (1978).

However, Plaintiff is entitled to only nominal damages. In its summary judgment decision, the Court noted that Plaintiff offered no facts "that could have plausibly altered the panel decision" to involuntarily medicate him. [Dkt. 139 at 23.] Although the Court subsequently granted Plaintiff's Motion to Appoint Expert [Dkt. 149], Plaintiff failed to secure a medical expert, and listed no independent physicians among his witnesses for trial who might have challenged the propriety of the decision to involuntarily medicate him. [Dkt. 303 (Third Trial Memorandum).] Absent evidence that Plaintiff would not have been medicated but for his procedural due process deprivation, Plaintiff cannot establish an actual injury arising out of his deprivation and is entitled to nominal damages not to exceed $1.00. *Carey*, 435 U.S. at 266-67 ("The denial of procedural due process should be actionable for nominal damages without proof of actual injury."); *Warren v. Pataki*, 823 F.3d 125, 143 (2d Cir. 2016) ("If the outcome would not have been different" had full procedural due process been afforded, "the plaintiff is presumptively entitled to no more than nominal damages."); *Poventud v. City of N.Y.*, 750 F.3d 121, 137 (2d Cir. 2014) ("[T]he denial of procedural due process should be actionable for nominal damages without proof of actual injury."); *Miner v. Glens Falls*, 999 F.2d 655, 660 (2d Cir. 1993) ("Absent a showing of causation

and actual injury, a plaintiff is entitled only to nominal damages" for the denial of procedural due process.).

Plaintiff is accordingly awarded nominal damages of $1.00 for his procedural due process claim and this case is dismissed. The Clerk is directed to close this file.

IT IS SO ORDERED this 15th day of May 2018 at Hartford, Connecticut.

_____/s/_____
Vanessa L. Bryant,
United States District Judge